593 A.2d 28

**BISHOP LEONARD REGIONAL CATHOLIC SCHOOL, Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 13, 1991.

Decided June 12, 1991.

Petition for Allowance of Appeal Denied Nov. 12, 1991.

430

Maura K. Quinlan, for petitioner.

Clifford F. Blaze, for respondent.

Joseph Kubacki, Jr., for intervenor Maria Wesley.

Before CRAIG, President Judge, and DOYLE, McGINLEY, SMITH, PELLEGRINI, KELLEY and BYER, JJ.

McGINLEY, Judge.

Bishop Leonard Regional Catholic School (Bishop Leonard) appeals from an order of the Unemployment Compensation Board of Review (Board) granting unemployment compensation benefits to Maria Wesley (Claimant).[1]

Claimant was last employed by Bishop Leonard as a fifth and sixth grade math and science teacher at a final rate of $11,000 per year. Her last day of work was December 22, 1989. The relevant facts, as found by the Board, are as follows:

3. The school has a policy providing as follows:

1.2 The Parish shall retain the prerogative to dismiss a teacher for serious public immorality, public scandal or public rejection of official teachings, doctrine, or laws of the Catholic Church. In the event that the Parish exercises such prerogative, the grievance procedure in this Handbook shall not be applicable. Such a termination would, however, be subject to review under the Code for the Assurance of Due Process of the Diocese of Pittsburgh.

4. Claimant did not sign a contract of employment in which she recognized the employer's right to dismiss a teacher who violated a law of the church.

---

1. Claimant has intervened in the present controversy pursuant to Pa.R.A.P. 1531(a).

5. Claimant, who is Catholic, entered into a relationship with a non-Catholic and they planned to be married on December 23, 1989.

6. Claimant did not cohabit with her fiance.

7. Claimant's fiance was divorced from a Catholic woman who subsequently initiated annulment proceedings. The marriage has not been annulled by the Catholic Church.

8. Because claimant's fiance's first marriage was to a Catholic and has not been annulled, he and claimant were unable to be married in the Catholic Church, so they decided to be married in a Presbyterian Church.

9. On or about December 13, 1989, claimant also told the principal, a Catholic nun, of her intentions to be married to a divorced man in the Presbyterian Church.

10. The principal told claimant she was unsure of what to do and that she needed to get in touch with the Diocesan Office.

11. About an hour later, the principal informed claimant she was terminated for violating a law of the Church.

12. The principal asked claimant to stay on until December 22, 1989, claimant's last day of work.

13. Claimant subsequently married her fiance on December 23, 1989.

Board's Decision, May 23, 1990, at 1–2. The Board affirmed the referee's granting of benefits [2] and concluded that "Claimant's actions do not rise to the level of willful misconduct ... [s]he did not violate a law of the church prior to the employer's decision to terminate her." Board's decision at 2–3.

On appeal Bishop Leonard argues: 1) that the Board erred in concluding Claimant's conduct did not constitute willful misconduct; 2) that the Board's determination was not supported by substantial evidence; and 3) that the Board's decision violates Bishop Leonard's first and four-

---

**2.** The referee determined that Bishop Leonard's policy was unreasonable because it forced Claimant to choose between marriage and her job and as a result Claimant had good cause for violating the policy.

teenth amendment rights by imposing a burdensome tax on religion. It is Claimant's position that Bishop Leonard's policy is ambiguous and that the denial of benefits on the basis of religious preference furthers the establishment of a particular religion.[3] Additionally, the Board and Claimant contend that Claimant was discharged before the alleged willful misconduct occurred.

■ Our scope of review is limited to determining whether there has been a constitutional violation or an error of law and whether the necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Kirkwood v. Unemployment Compensation Board of Review*, 106 Pa.Commonwealth Ct. 92, 525 A.2d 841 (1987).

Initially, Bishop Leonard argues that Claimant's actions constitute willful misconduct because she was informed that marriage to her fiance, prior to an annulment, would be a public rejection of the laws of the Church, thereby subjecting her to termination according to its policy. Bishop Leonard further argues that Claimant did not have good cause for her conduct. Claimant argues that Bishop Leonard's policy is ambiguous and asserts that the term "public rejection" as it appears in the policy is subject to different interpretations. Claimant maintains that she did not know that her marriage would constitute a "public rejection" of the laws of the Catholic Church subjecting her to dismissal.

■ The question of whether conduct rises to the level of willful misconduct is a question of law to be determined by this Court. *Fritz v. Unemployment Compensation Board of Review*, 66 Pa.Commonwealth Ct. 492, 446 A.2d 330 (1982). Willful misconduct is defined as conduct that represents a wanton and willful disregard of an employer's interest, deliberate violation of rules, disregard of standards of behavior which an employer can rightfully expect from

---

**3.** The Board and Claimant assert that this Court is able to render a decision as to the unemployment compensation issues and need not address the constitutional issues. *See* Brief of the Board at 5 and Brief of Claimant at 7.

his employee, or negligence which manifests culpability, wrongful intent, evil design, or intentional and substantial disregard for the employer's interest or employee's duties and obligations. *Frick v. Unemployment Compensation Board of Review*, 31 Pa.Commonwealth Ct. 198, 375 A.2d 879 (1977). "Where the willful misconduct is based upon a violation of an employer rule or policy, the employer must establish the existence of the rule or policy and that the employee was aware of it." *Sauer v. Unemployment Compensation Board of Review*, 110 Pa.Commonwealth Ct. 103, 108, 531 A.2d 1174, 1176 (1987). A violation of a known and reasonable rule establishes willful misconduct. *Williams v. Unemployment Compensation Board of Review*, 109 Pa.Commonwealth Ct. 329, 531 A.2d 88 (1987).

■ In the present controversy, Bishop Leonard instituted a policy prohibiting its teachers from publicly rejecting "the official teachings, doctrine, or laws of the Catholic Church." Teacher Handbook, Chapter I, Teacher Requirements, Certified Record (C.R.), Item No. 3. Father Lawrence Donardo (Fr. Donardo), Chancellor for the Diocese Of Pittsburgh, testified that "[m]arriage as a sacrament ... is a public action" and that "when people enter marriage, whether they enter marriage within the realm of the church by its rule or enter marriage somewhere else, they are making a public proclamation that they are accepting to be married to another person." Notes of Testimony, February 21, 1990 (N.T.), at 7. Fr. Donardo stated Claimant's marriage was invalid because it was a public rejection of the Church's law which holds that marriage is indissoluble. Fr. Donardo stated that "a person who violates the church's law, proclaims that they, in fact, violated the church's law" and that "because it's in the public forum, automatically is a public repudiation of that particular law." N.T. at 7. This policy applied to Catholics and non-Catholics.[4]

---

**4.** Fr. Donardo testified that "a non-catholic teacher who marries a catholic person and this marriage is not in conformity with the rules of the church ... that person would be subject to ... discharge." N.T. at 9.

A review of the record reveals Claimant taught in the Catholic school system beginning in August of 1987. Although Claimant did not sign a contract of employment with Bishop Leonard[5], Claimant was informed by Bishop Leonard that her marriage was a violation of its policy and would result in her termination. Claimant testified that she notified Sister Dorothy on December 13, 1989, of her intention to marry. Sister Dorothy, after contacting the diocese office, informed Claimant that her marriage would result in her termination. N.T. at 14. Claimant acknowledged that she was informed "exactly what rule [she] was breaking ... in the handbook." N.T. at 14. Claimant maintains that because she did not communicate her marriage plans to her students that her marriage did not reflect on her ability to teach math and science. We disagree.

Fr. Donardo testified that Catholic teachers are expected to be role models for their students in and out of the classroom and that their failure to follow the Catholic teachings compromises their effectiveness in the classroom.[6] "The teacher is employed by a religious organization, subject to the direction and discipline of religious authorities, and works in a system dedicated to rearing children in a particular faith." *Lemon v. Kurtzman,* 403 U.S. 602, 618, 91 S.Ct. 2105, 2114, 29 L.Ed.2d 745 (1971). We agree that Claimant's conduct directly reflected on her

**5.** Paragraph four of the standard contract for full time lay teachers states:

> Teacher recognizes the religious nature of the Catholic School and agrees that Employer has the right to dismiss a teacher for ... public rejection of the official teachings, doctrine or laws of the Roman Catholic Church, thereby terminating any and all rights that the Teacher may have hereunder....

Contract For Elementary School Full Time Lay Teachers, Item No. 3.

**6.** Fr. Donardo stated:

> Very briefly ... the primary purpose is to teach ... young people, about the catholic faith. And therefore, the people who happen to teach there, happen to be responsible for the school. The primary interest is that they not only be skilled teachers, but that they also have within their own minds the philosophy of catholic education and their own actions as ... as obviously that they live out the faith both the Christian gospel and obviously the catholic faith....

N.T. at 10.

ability to perform her assigned duties and adversely affected the interest of Bishop Leonard.

 Bishop Leonard next argues that there is substantial evidence to support a finding that Claimant violated its policy. Specifically, Bishop Leonard argues that Claimant remained employed during the time that she was in compliance with the policy and that she was discharged after it became apparent that the marriage would take place on December 23, 1989. The Board and Claimant maintain that Claimant did not violate Bishop Leonard's policy because Claimant was terminated as a result of her intention to marry and not because of her marriage.

Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Pine Haven Residential Care Home v. Department of Public Welfare*, 99 Pa.Commonwealth Ct. 1, 512 A.2d 59 (1986). In determining whether there is substantial evidence to support the Board's findings, we must examine the testimony in the light most favorable to the prevailing party, giving that party the benefit of any inference which can be drawn logically and reasonably from the evidence. *Johnson v. Unemployment Compensation Board of Review*, 94 Pa.Commonwealth Ct. 24, 502 A.2d 738 (1986).

The Board found that, on December 13, 1989, the principal of Bishop Leonard "informed Claimant she was terminated for violating a law of the church." Board's Findings of Fact Nos. 9 and 11 at 2. A review of the record fails to support the Board's findings. In fact, Bishop Leonard and Claimant agree that Claimant was terminated because of her marriage. At the hearing before the referee, counsel for Bishop Leonard stated that "[i]n this case claimant, after discussing the fact that her planned marriage would be in violation of the rules of the school, went forward with her marriage and subsequently, her employment terminated on this basis." N.T. at 3. Counsel for Claimant stated "she [Claimant] was forced to marry outside of the catholic church and a result of that situation, the school terminated

her employment."[7] N.T. at 4. Further, Claimant's own testimony corroborates that she was terminated because of her marriage. Claimant testified that "it was just a matter of an hour she [principal] came back and said, you know, *you have to be terminated."* N.T. at 14. (emphasis added). Claimant remained employed as long as she was in compliance with Bishop Leonard's policy or until December 22, 1989.

 Lastly, Claimant argues that her marriage was in compliance with the laws of Pennsylvania and that a denial of benefits based on religious dogma constitutes an unconstitutional establishment of religion.

The Establishment Clause of the First Amendment of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion...." U.S. Constitution, Amendment I. Article I, Section 3 of the Pennsylvania Constitution relevantly provides that "no preference shall ever be given by law to any religious establishments or modes of worship." The primary purpose of the Establishment Clause is to prevent "the sponsorship, financial support and active involvement of the sovereign in religious activity." *Walz v. Tax Commission,* 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970).

Section 402(e) of the Unemployment Compensation Law (Law), 43 P.S. § 802(e)[8] provides in pertinent part that "[a]n employee shall be ineligible for compensation for any week ... (e) [i]n which unemployment is due to [her] discharge ... from work for willful misconduct connected with [her] work." As stated earlier, Bishop Leonard established the existence of a reasonable policy, that Claimant was aware

7. The referee confirmed that there was no factual dispute between the parties. The referee stated:
So, where ... does that leave us? ... To proceed, claimant went ahead with the marriage ... and then was terminated by the employer under the policy you have been discussing. Okay, well why don't you call a witness, then, for the purposes that we just outlined.
N.T. at 6.

8. Act of December 5, 1936, Second Ex.Sess.P.L. (1937) 2897, *as amended,* 43 P.S. §§ 751–914.

of the policy and that her violation of policy constituted willful misconduct. Claimant argues that denying her benefits because her marriage is a violation of Bishop Leonard's policy serves to advance the Catholic religion.

In *Lemon* the United States Supreme Court set out a three-pronged test[9] to determine, whether "the *Government itself* has advanced religion through its own activities and influences." *Corporation of Presiding Bishop v. Amos*, 483 U.S. 327, 328, 107 S.Ct. 2862, 2864, 97 L.Ed.2d 273 (1987) (emphasis in original).

In *Hobbie v. Unemployment Appeals Commission of Florida*, 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987), Paula Hobbie was employed by Lawton and Company (Employer), a jeweler, for two and one-half years. In April of 1984, Paula Hobbie informed her Employer that she was to become a practicing Seventh–Day Adventist and that she would no longer be able to work from sundown on Friday to sundown on Saturday. Paula Hobbie was terminated and her claim for unemployment compensation benefits was denied because of "misconduct connected with ... work." Fla.Stat. § 443.101(1)(a) (1985). The Unemployment Appeals Commission (Appeals Commission) affirmed the denial of benefits. "Hobbie challenged the Appeals Commission's order in the Florida Fifth District Court of Appeals" and "that court summarily affirmed the Appeals Commission." *Hobbie*, 480 U.S. at 139, 107 S.Ct. at 1048. The United States Supreme Court reversed determining that "[u]nder our precedent, the Appeals Commission's disqualification of ... [Paula Hobbie] from receipt of benefits violates the Free Exercise Clause of the First Amendment, applicable to the States through the Fourteenth Amendment." *Hobbie*, 480 U.S. at 139, 140, 107 S.Ct. at 1048 (footnote omitted). The United States Supreme Court also rejected the Appeals Commission's argument that the award of benefits would

9. The *Lemon* test requires that the law serve "a secular legislative purpose"; that the law have "a principal or primary effect ... that neither advances or inhibits religion"; and that the law does not promote an excessive entanglement of government and religion. *Id.* at 612, 91 S.Ct. at 2111.

violate the Establishment Clause. In *Hobbie* the United States Supreme Court determined that "[t]his Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Id.* at 144–145, 107 S.Ct. at 1051 (footnote omitted).

In *Corporation of Presiding Bishop,* the United States Supreme Court also recognized that the accommodation of the religious beliefs of the employer does not violate the Establishment Clause. The United States Supreme Court stated:

[R]eligious groups have been better able to advance their purposes on account of many laws that have passed constitutional muster: for example, the property tax exemption at issue in *Walz v. Tax Comm'n* supra, or the loans of school books to school children, including parochial school students, upheld in *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). A law is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose.

*Corporation of Presiding Bishop,* 483 U.S. at 336–337, 107 S.Ct. at 2869 (emphasis in original).

A denial of benefits pursuant to the Act, secular in nature, is not an excessive entanglement of government and religion. The failure to charge the coffers of Bishop Leonard because of Claimant's failure to follow its policy does not advance or promote a particular religion in violation of the Establishment Clause. The Commonwealth accommodates Bishop Leonard by allowing it to advance its religion and as a result to discharge any employee in violation of its policy and the teachings and laws of the Church.

Accordingly, we reverse the decision of the Board.

## ORDER

AND NOW, this 12th day of June, 1991, the order of the Unemployment Compensation Board of Review, dated May 23, 1990, at B–282301, is reversed.

KELLEY, J., dissents.

440

SMITH, Judge, dissenting.

I strongly dissent. Every facet of the majority Court's opinion—its analysis, conclusions, assumptions, and holding—serves to apply Section 402(e) of the Law to the facts of this case in a manner that violates the Establishment Clause of the First and Fourteenth Amendments of the United States Constitution as well as Article I, Section 3 of the Pennsylvania Constitution. Because the majority's analysis ignores the fundamental prohibition of the Establishment Clause and Article I, Section 3 against excessive entanglement by the government in religious affairs and ultimately sponsors one thread of religious belief to the disadvantage of another, in addition to the disadvantage of other fundamental rights, I am compelled to voice my dissent.

## I

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. The U.S. Supreme Court has unwaveringly determined that the foremost evils against which the clause was intended to protect are the "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Commission of City of New York*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). *See also Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Writing separately in *Lemon*, Justice Brennan stated that:

> [w]hat the Framers meant to foreclose, and what our decisions under the Establishment Clause have forbidden, are those involvements of religious with secular institutions which (a) serve the essentially religious activities of religious institutions; (b) employ the organs of government for essentially religious purposes; or (c) use essentially religious means to serve governmental ends, where secular means would suffice. Where the secular and religious institutions become involved in such a manner, there inhere in the relationship precisely those dangers—

as much to the church as to the state—which the Framers feared would subvert religious liberty and the strength of a system of secular government.

*Id.* at 643, 91 S.Ct. at 2126 (quoting *School District of Abington Township v. Schempp,* 374 U.S. 203, 294–95, 83 S.Ct. 1560, 1609–10, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring)). Moreover, the Establishment Clause requires that the end result of government action must avoid the excessive entanglement with religion that the clause prohibits, regardless of the motivation. "Determining that the legislative purpose of tax exemption is not aimed at establishing, sponsoring, or supporting religion does not end the inquiry.... We must also be sure that the end result—the effect—is not an excessive government entanglement with religion." *Walz,* 397 U.S. at 674, 90 S.Ct. at 1414.

Article I, Section 3 of the Pennsylvania Constitution is more direct and self-evident than the Establishment Clause in its prohibitions and statement of rights:

All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; *no human authority can, in any case whatsoever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship.* (Emphasis added.)

The difficulty of integrating government institutions with matters occurring within or affecting religious or parochial schools is well recognized. "The substantial religious character of these church-related schools gives rise to the entangling church-state relationships of the kind the Religious Clauses sought to avoid." *Lemon,* 403 U.S. at 616, 91 S.Ct. at 2113. For this reason, this Court determined that religious schools were exempt from the mandatory requirements of providing unemployment compensation benefits under the Law in *Christian School Ass'n of Greater Harrisburg v. Department of Labor and Industry,* 55 Pa.Com-

monwealth Ct. 555, 423 A.2d 1340 (1980). Notably, this Court in *Christian School Ass'n* focused upon the constitutional difficulties inherent in situations exactly like the one now before this Court, where the issue of eligibility for benefits hinges upon whether the reason for an employee's discharge, based upon matters of religious dogma, involves the employee's willful misconduct. Quoting *Grace Brethren Church v. California*, Nos. CV 79–93 MRP, CV 79–162 MRP (C.D.Cal., filed Sept. 21, 1979), slip op. at 12, *vacated and remanded on other grounds*, 457 U.S. 393, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982), this Court recognized that:

> [D]isputes unquestionably will arise in situations where employees are dismissed for cause and the reason given by the church school is failure to adhere to religious tenets of the church.
>
> The type of inquiry necessary to the resolution of controversies such as these is almost identical to that which the [U.S. Supreme] Court found to involve dangers of excessive entanglement in [*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) ].

55 Pa.Commonwealth at 563–64, 423 A.2d at 1345.

In this case, Bishop Leonard has, for reasons of its own, waived its exemption under the Law and has chosen to provide its employees the benefit of unemployment compensation. This does not mean that constitutional concerns are placed aside, nor does it mean, as Bishop Leonard appears to argue, that they apply to protect only one party in this proceeding, namely Bishop Leonard. The majority's opinion, however, fails to address the dangers articulated by a long string of Supreme Court decisions regarding the Establishment Clause in cases of this nature, disregards the clear language of the Pennsylvania Constitution, and avoids the concerns expressed earlier by this Court in *Christian School Ass'n.* Instead, the majority embarks on a traditional willful misconduct analysis as if the Claimant, rather than merely deciding to marry a person whose circumstances are disapproved of by her employer, was caught

with her hand in the till or asleep on the job or absent without leave. The Establishment Clause and Article I, Section 3 prohibit this simple approach.

## II

The basis for Bishop Leonard's contention that Claimant was discharged for willful misconduct connected with her work is that Claimant violated a rule or policy of the employer, namely, a prohibition against "public rejection of official teachings, doctrine, or laws of the Catholic Church." This Court has consistently held that a violation of a known and *reasonable* rule or policy of an employer may constitute willful misconduct except when the employee has good cause to violate the rule or policy. *Spirnak v. Unemployment Compensation Board of Review*, 125 Pa.Commonwealth Ct. 354, 557 A.2d 451 (1989). Claimant argues that Bishop Leonard's rule is ambiguous; that she did not know that her actions would constitute a violation of that rule (nor, apparently did her principal, who is a nun); and that in any event she had good cause to violate the rule, if a violation did in fact occur, since that violation consisted only of entering into an institution (marriage) expressly permitted by the Commonwealth. Moreover, Bishop Leonard's rule or policy forced her between the Scylla and Charybdis of either keeping her job and foregoing marriage to the person of her choice and in the church of her choice, or losing her job and marrying the person of her choice in the church of her choice, which is unacceptable to the Catholic Church.

The majority, however, fails to address any of Claimant's contentions (except Claimant's Establishment Clause argument), and concludes without any analysis or discussion that Bishop Leonard's rule or policy is reasonable and then that the evidence showed that Claimant's intention to marry a divorced man violated that rule or policy. The majority completely ignores Claimant's argument that if a violation did indeed occur, Claimant had a good excuse for carrying through with her actions, thus depriving Claimant of a

meaningful review and ignoring an issue that this Court's settled law requires be discussed. Further, the majority *found* that Claimant's desire to marry a divorced man "directly reflected on her ability to perform her assigned duties and adversely affected the interest of Bishop Leonard"—something neither the referee nor the Board found as a fact or even discussed; and thus, the majority impermissibly strays into the area of fact finding in order to champion its cause.[1] Maj. op. at 437. Therefore, even under a traditional willful misconduct analysis, the majority's opinion is insupportable.

Turning to the constitutional concerns, it need be noted that in order to come to the conclusion that Claimant is ineligible for benefits on the grounds of willful misconduct, the majority must arrive at the following conclusions: (a) that Bishop Leonard's rule or policy prohibiting a public rejection of the official teachings, doctrine, or laws of the Catholic Church is reasonable; (b) that Claimant's decision to marry a divorced person violates this church-based rule or policy; (c) that as applied, Bishop Leonard's rule or policy is reasonable: *i.e.*, that it is a reasonable rule or policy which prohibits an employee from marrying a divorced person; and (d) that Claimant did not have good cause to marry the person of her choice in opposition to Bishop Leonard's rule or policy. One must seriously question how any of these determinations can be made by an arm of the government, whether by this Court or the Board, without an excessive entanglement in matters of religion. Upon what basis, for example, can this Court hold that one church employer's work rule, based upon religious dogma, is reasonable and that another's, also based upon religious dogma, is unreasonable without violating the Establishment Clause? The result of such decisions will unmistakably have the effect of endorsing one religion's views over that

1. Arguably, the majority is also fact finding in accepting Fr. Donaro's testimony that a decision to marry a divorced person publicly rejects the law of the Catholic Church since neither the referee nor the Board actually found as a fact that Claimant's actions were a violation of Bishop Leonard's rule or policy.

of another, precisely what the Establishment Clause prohibits. *See Walz; Christian School Ass'n.*

Indeed, Bishop Leonard argues that a finding that its rule or policy is unreasonable would be a violation of the Establishment Clause and that this Court must find its rule or policy to be reasonable "as a matter of law." Petitioner's Brief, p. 19, n. It would be equally violative of the Establishment Clause, however, if this Court, as it has done, were to find that a work rule based upon religious dogma *is* reasonable. As the Supreme Court held in *School District of City of Grand Rapids v. Ball*, 473 U.S. 373, 389, 105 S.Ct. 3216, 3225–26, 87 L.Ed.2d 267 (1985):

> Government promotes religion as effectively when it fosters a close identification of its powers and responsibilities with those of any—or all—religious denominations as when it attempts to inculcate specific religious doctrines. If this identification conveys a message of government endorsement ... of religion, a core purpose of the Establishment Clause is violated.

Further, Article I, Section 3 of the Pennsylvania Constitution expressly prohibits the granting of preferences to any religious establishment, and that is exactly what happens when this Court engages in a process that permits it to declare religiously based work rules to be either reasonable or unreasonable.

Perhaps one may argue that the issue of reasonableness can be determined on an "objective" basis as if this Court had before it the work rule, non-religiously based, of a secular employer. In *Spirnak*, this Court stated that "[i]n determining reasonableness, this Court should consider whether application of the rule or policy under the circumstances is fair and just and appropriate to accomplish a legitimate interest of the employer." 125 Pa.Commonwealth Ct. at 357, 557 A.2d at 453. But these standards make the inquiry only that much more difficult when a religiously-based work rule is present. How can this Court determine whether a rule based on religious dogma is fair, just, or appropriate without again stamping governmental

approval on some religious beliefs while disapproving of or disparaging others? The majority determines, however, that it is a fair, just, and appropriate work rule which prohibits teachers from marrying persons whose circumstances are disapproved of by the church employer, and that the teachers are without good cause for violating such a rule.

## III

Further, the majority's decision to follow this Court's established willful misconduct analysis in this case opens up other First Amendment dilemmas. At the hearing, Bishop Leonard produced an expert in its church doctrine and laws who testified that Claimant's conduct constituted a public rejection of that church's official doctrine and law. What would have been the result if Claimant had produced her own expert to testify that her actions are not a public rejection of official doctrine and law? The Board would have been placed in the position of deciding matters of religious law or doctrine in order to determine whether a work rule was violated. This is expressly beyond its, and any court or tribunal's, function and competence; and, again, it would be a clear violation of the Establishment Clause for the Board to make such a determination and this Court to uphold it. *See United States v. Lee,* 455 U.S. 252, 257, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982) ("courts are not arbiters of scriptural interpretation"); *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, ——, 110 S.Ct. 1595, 1604, 108 L.Ed.2d 876 (1990) ("[r]epeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim"). By its holding, however, and especially in light of Claimant's argument that Bishop Leonard's work rule or policy is ambiguous and that she did not believe she was violating it, is not the majority also straying into this First Amendment prohibition?

Moreover, as the Supreme Court has time and again held, the end result or effect of the government action must also be free of First Amendment violation. *See, e.g., Lemon* and *Walz.* What is the end result of the majority's holding? First it must be observed, as Judge Colins persuasively wrote in dissent in *Bishop Carroll High School v. Unemployment Compensation Board of Review,* 125 Pa.Commonwealth Ct. 302, 313, 557 A.2d 1141, 1146 (1989), *appeal denied,* 525 Pa. 604, 575 A.2d 569 (1990), a case remarkably similar in its facts to the present case: "By denying unemployment compensation under these circumstances, we are making two religious declarations: (1) we will be allowing a religion to use the [Law] to further its tenets on a *de facto* basis; and (2) we will be using the [Law] to recognize a hierarchical system of marriage within the Commonwealth." In *Bishop Carroll,* a teacher was discharged from his position in a Catholic school after he notified his principal that he was cohabiting with a divorced woman. The teacher, unlike Claimant in the present case, had signed an employment contract that set forth the policy against public rejection of the official teachings, doctrine, and laws of the Catholic Church. The teacher told the school of his plans to marry his companion civilly and then in the Catholic Church after she obtained an annulment, and they subsequently did marry in a ceremony in a different church (as did Claimant in this case). Notwithstanding, the school opposed the teacher's eligibility for benefits claiming willful misconduct, and this Court upheld that position for essentially the same reasons set forth in the majority's opinion in this case.[2]

Judge Colins is certainly correct that the effect of the holding in *Bishop Carroll* and the identical holding in this case will serve, not to merely accommodate religion as the majority contends, but to endorse the tenets of a particular religion and give primacy to one religion's view of marriage over any other view of marriage. This includes the view of the Commonwealth and of any church that does not follow

---

**2.** Curiously, the majority does not use *Bishop Carroll* as authority for its holding, though the cases are virtually identical.

the Catholic Church in its beliefs about divorce, including the Presbyterian Church where Claimant married.[3] Also, there is no escaping the conclusion that the majority's holding in this case serves to prefer or endorse Bishop Leonard's religious beliefs over that of the Claimant's and serves to prefer or endorse Bishop Leonard's religious beliefs over Claimant's equally fundamental right of privacy. As explained below, the majority's holding sponsors and gives primacy to the official teachings, doctrine, and laws of the Catholic Church through application of the Law and in so doing gives financial support to the Church to the detriment of another who, according to Bishop Leonard, happens not to adhere to the official teachings, doctrine, and laws of its church.[4]

## IV

In a line of cases, one of which the majority relies upon, the Supreme Court has held that an individual who is

**3.** The following exchange between the referee and Bishop Leonard's attorney at the hearing in this case is instructive:

QR: In what way did claimant act contrary to the laws of the church?

EL: She, being a catholic, entered into a marriage with a divorced catholic [he was actually Protestant] in the Presbyterian Church. This marriage is not valid in the eyes of the Catholic Church. It violated the section of the rule that states that it was a public repudiation and rejection from official church teachings, doctrine, and laws.... Father Donardo ... could give a further explanation about that.

N.T., p. 4.

**4.** Further, this holding absolutely violates Article I, Section 3 of the Pennsylvania Constitution which provides in part that "no human authority can, *in any case whatsoever,* control or interfere with rights of conscience." Claimant, by deciding to marry outside the Catholic Church, has exercised her right of conscience; and the majority penalizes her for doing so by stripping away her right to benefits under the Law. It should go without saying that it makes no difference that one party in this action is a member of an established church and the other, while perhaps considering herself a member of that church, deviates from its teachings if only in one respect. The First Amendment protects not only "established" religions but all forms of faith and belief, including non-belief, and does not allow for the primacy of any. *See Frazee v. Illinois Department of Employment Security,* 489 U.S. 829, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989).

discharged for cause related to the exercise of his or her religious beliefs, or who refuses work for the same reason, may not under the Free Exercise Clause of the First Amendment be deprived of unemployment compensation benefits.[5] *See Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (Sabbatarian discharged for refusal to work on Saturdays); *Thomas v. Review Board of Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (Jehovah's Witness forced to leave work when employer transferred him to a division that made armaments); *Hobbie v. Unemployment Appeals Commission of Florida,* 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987) (employee discharged for refusal to work on Saturdays after conversion to the Seventh Day Adventist Church); *Frazee v. Illinois Department of Employment Security,* 489 U.S. 829, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989) (Christian, not a member of an established religious sect or church, refused to accept a position offered by an employment agency because it required work on Sunday). The posture of these cases is ably articulated in *Sherbert:*

> For '[i]f the purpose or *effect* of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is invalid even though the burden may be characterized as being only indirect.' *Braunfeld v. Brown* ... (366 US [599] at 607 [ (1961) ] ). Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forgo that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

5. The Free Exercise Clause of the First Amendment reads: "Congress shall make no law ... prohibiting the free exercise [of religion]...." U.S. Const. amend. I.

*Id.* 374 U.S. at 404, 83 S.Ct. at 1794 (emphasis added). Similarly, the government imposition of a similar choice upon Claimant forced by the majority opinion in this case is the same kind of burden on Claimant's free exercise rights as if a fine were imposed against her for marrying outside the Catholic Church, which is effectively what is happening.

The Court in *Thomas* further stated:

Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious faith, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Id.* 450 U.S. at 717–18, 101 S.Ct. at 1432. This should be no less true where the state conditions receipt of an important benefit upon conduct *prescribed* by a religious faith. There seems no question that using the Law to require employees to adhere to the religious beliefs of their employers upon pain of forfeiting benefits thereunder places a state-sponsored burden on the free exercise of religion in violation of the Free Exercise Clause. Further, the Court has held that "[g]overnment may neither *compel affirmation of a repugnant belief* ... nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities ..." *Sherbert,* 374 U.S. at 402, 83 S.Ct. at 1793 (citations omitted; emphasis added), or, for that matter, to one's employer. A religious, spiritual view abhorrent to one's employer (in this case, marriage to a divorced person or in a different church) is afforded as great a degree of protection under the First Amendment as the employer's religious or spiritual views; and in accordance with the Supreme Court's holdings in *Sherbert, Thomas, Hobbie,* and *Frazee,* one cannot be stripped of state-created benefits for expressing and acting upon religious or spiritual views different from that of one's employer.

Moreover, one finds a parallel in this case to *Lee,* where the Supreme Court held that "[g]ranting an exemption from social security taxes to an employer [on religious grounds] operates to impose the employer's religious faith on the employees." 455 U.S. at 261, 102 S.Ct. at 1057. The exemption of Bishop Leonard from its voluntary participation in the unemployment compensation system under the circumstances of this case has exactly the same effect. Although the majority correctly states that the purpose of religion is to advance its own beliefs, religions cannot do so by employing the organs of the state in a manner which infringes upon the beliefs of others and sheds the religious employer's financial burden upon employees who disagree in matters of faith.

The state may, however, substantially burden the free exercise of religion if there exists a compelling state interest in the regulation of a subject within the state's constitutional power to regulate. *Sherbert.* I can discern no compelling state interest which justifies the burden the majority places upon Claimant's free exercise of her beliefs. Certainly, the primacy of the official doctrines of the Catholic Church, as enunciated by Bishop Leonard, over the beliefs of Claimant concerning marriage in or outside of that church is not sufficient. On the contrary, it is abhorrent to the First Amendment.[6]

6. Further, the majority's decision also serves to infringe upon Claimant's constitutional right to privacy. It is well established that "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982). *See also Fabio v. Civil Service Commission of City of Philadelphia,* 489 Pa. 309, 414 A.2d 82 (1980) (the constitutional right to privacy protects from governmental interference activities relating to marriage). The majority ignores this fundamental constitutional precept and holds that since an accommodation of religion is sometimes permitted under the First Amendment, this Court will use the Law to further the religious beliefs of the Catholic Church at the expense of Claimant's beliefs and her constitutional right to make free personal choices concerning marriage and family life or suffer the pain of losing state-created benefits. There is no basis in constitutional law that could support such a result.

## V

Having established that the majority's opinion is insupportable in its own right and as a matter of constitutional law, the discussion must address the constitutional concerns raised by Bishop Leonard. Bishop Leonard argues that an affirmation of the Board's order would essentially result in a tax levied against it for *its* free exercise of religion in violation of the First Amendment. There is no question that either result in this case—the granting or denial of benefits—involves some entanglement with religion. *See Bishop Carroll* (Colins, J. dissenting). What must be avoided is an excessive entanglement of the state and religion. *Walz.* Pursuant to decisions of the U.S. Supreme Court, a grant of benefits to Claimant would be constitutionally permissible and indeed in accordance with the constitutional scheme. First, Judge Colins' able analysis in *Bishop Carroll* is noted:

> A state system cannot effectuate religious doctrines. Bishop Carroll of its own volition participated in the unemployment compensation system. It was never required to participate and remains free to terminate its participation at any time. Once it chooses to voluntarily assume this relationship, it thereby places itself within the jurisdiction of the [Law] in the same manner as any other employer and religious holdings must give way to secular laws. Bishop Carroll must accept the fact that under the mandate of the First Amendment the state has an obligation to remain as neutral as possible in the face of religious differences. *School District of Abington v. Schempp,* 374 U.S. 203, 215 [83 S.Ct. 1560, 1567–68, 10 L.Ed.2d 844].

125 Pa. Commonwealth Ct. at 312, 557 A.2d at 1146. This analysis is mirrored by the words of the Supreme Court in *Lee:*

> Congress and the courts have been sensitive to the needs flowing from the free exercise clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious

beliefs. When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith *are not to be superimposed on the statutory schemes which are binding on others in that activity.* (Emphasis added.)

455 U.S. at 261, 102 S.Ct. at 1057. The Court in *Lee* rejected an argument by a self-employed Old Order Amish farmer and carpenter that the imposition of social security taxes and requirements violated his First Amendment free exercise rights and those of his employees because members of his religion believe that there is a religiously-based obligation to provide for their fellow members the kind of assistance contemplated by the social security system, and therefore their religion prohibits acceptance of social security benefits and payment of social security taxes.

Therefore, Bishop Leonard, having voluntarily participated in the state-created system of unemployment compensation relief, is prohibited from superimposing its religious beliefs upon the statutory scheme of the Law. Although there is no question that Bishop Leonard has the right to terminate any employee for violating religious tenets of the Catholic Church, or for any other reason absent an agreement to the contrary, it cannot require the Commonwealth's unemployment compensation system to define violations of the Catholic Church's religious tenets as work-related willful misconduct. *See Bishop Carroll* (Colins, J., dissenting). On the other hand, it is also clear that "no State 'may exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it,* from receiving the benefits of public welfare legislation.' " *Sherbert,* 374 U.S. at 410, 83 S.Ct. at 1797 (quoting *Everson v. Board of Education of Ewing Township,* 330 U.S. 1, 16, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947)) (emphasis in the original). Moreover, an award of benefits to Claimant in this case would reflect "nothing more than *the governmental obligation of neutrality in the face of*

*religious differences,* and [would] not represent the involvement of religious with secular institutions which it is the object of the Establishment Clause to forestall." *Id.* 374 U.S. at 409, 83 S.Ct. at 1797 (emphasis added).

There being no act committed by Claimant which any employer could complain of absent a religious tenet to the contrary, the order of the Board must be affirmed.

BYER, Judge, dissenting.

I respectfully dissent and would affirm the decision to grant unemployment compensation benefits. Because unemployment compensation benefits are paid by the state, I believe that a religious teaching, standing alone, cannot be the predicate for a determination by the state to deny benefits based upon willful misconduct. To hold otherwise would involve the unemployment compensation authorities and the courts in having to make determinations based upon religious principles rather than objective legal principles and would result in treating employees of religious institutions differently from employees of non-religious employers in determining entitlement to unemployment compensation benefits.

Furthermore, I find the majority's decision very troubling when I consider how we draw the appropriate lines in cases which might arise in the future. For example, what would be the result if the religious teaching in question were that the employee could not marry a person of a different religion? What would be the result if the religious teaching were that an employee could not marry a person of a different race? I would like to think we would hold that the state may not deny payment of benefits on the basis of willful misconduct in these hypothetical cases, but on what basis would we distinguish this case?

I think the best way to answer these questions is on an objective basis, treating employees of religious employers and non-religious employers equally for purposes of paying unemployment compensation benefits. I have no doubt that the work rule involved in this case would not be a basis for

the state to deny benefits on the basis of willful misconduct if it were imposed by a non-religious employer. I would hold no differently here.[1]

**1.** I do not imply that a religious institution has no right to terminate an employee for violating religious teachings. *See Little v. Wuerl,* 929 F.2d 944 (3d Cir.1991). That is a far different question from the question in this case, which is whether the state may deny benefits based upon a religious teaching. The same considerations of avoiding excessive entanglement which motivated the Third Circuit in *Little* to hold that Title VII does not apply to this situation should cause us to affirm the award of benefits here.