James M. MARTIN, Plaintiff/Appellee,

v.

BEER BOARD FOR CITY OF DICKSON, Defendant/Appellant.

Court of Appeals of Tennessee, Middle Section, at Nashville.

April 26, 1995.

Michael J. Flanagan, Nashville, for Plaintiff/Appellee.

Jerry V. Smith, Dickson, for Defendant/Appellant.

## OPINION

KOCH, Judge.

This appeal involves the constitutionality of the City of Dickson's ordinance prohibiting the sale of beer on Sunday. A convenience store owner filed a petition for writ of certiorari in the Circuit Court for Dickson County requesting review of the beer board's decision to suspend his permit for sixty days for selling beer to a minor and for selling beer on Sunday. The trial court reduced the suspension to thirty days after finding that the ordinance prohibiting the sale of beer on Sunday violated Tenn. Const. art. I, § 3. The city has appealed. We have determined that the ordinance prohibiting the sale of beer on Sunday does not run afoul of either Tenn. Const. art. I, § 3 or Tenn. Const. art. I, § 8. Accordingly, we reverse the trial court's order and reinstate the sixty-day suspension.

## I.

James M. Martin owns the Kwik Stop Market on Highway 70 in Dickson. He possesses a permit to sell beer issued by the Dickson City Council that also functions as the city's beer board. After the Dickson Police Department caught one of Mr. Martin's employees selling beer illegally, Mr. Martin was charged with violating two city ordinances prohibiting the sale of beer on Sunday and prohibiting the sale of beer to minors.[1] The beer board conducted a hearing in September 1992 and suspended Mr.

---

1. Dickson, Tenn., Mun.Code ch. 2, § 2–213(3) prohibits making or allowing "any sale of beer between the hours of 12:00 midnight and 8:00 a.m. during any night of the week; at any time on Sunday; or on election days before and while the polls are lawfully open." Dickson, Tenn.,

Martin's permit for sixty days—thirty days for selling beer to a minor and an additional thirty days for selling beer on Sunday.

Mr. Martin requested the Circuit Court for Dickson County to review the suspension, alleging, among other things, that the ordinance prohibiting the sale of beer on Sunday "discriminates against religions who do not celebrate the sabbath on Sunday" and that the restriction is "arbitrary and capricious." The trial court conducted a hearing in October 1992. In an order filed in December 1992, the trial court affirmed the thirty-day suspension for selling beer to a minor but reversed the suspension for selling beer on Sunday. The trial court found that Dickson's ordinance prohibiting Sunday beer sales was "purely based on religious reasons" and, therefore, that it violated Tenn. Const. art. I, § 3 because Sunday is "recognized as the Christian Sabbath." The city asserts on this appeal that its ordinance is not the type of religious preference that is prohibited by Tenn. Const. art. I, § 3.

## II.

### REGULATION OF THE SALE OF BEER

█ Alcoholic beverages have always been considered to be dangerous to the community. *State ex rel. Saperstein v. Bass,* 177 Tenn. 609, 617, 152 S.W.2d 236, 239 (1941). Because of their potential adverse effect on the community's health, safety, and welfare, the State may invoke its police power to prohibit the sale of alcoholic beverages completely or to license and regulate their sale stringently. *Barnes v. City of Dayton,* 216 Tenn. 400, 407, 392 S.W.2d 813, 816 (1965); *Landman v. Kizer,* 195 Tenn. 13, 16, 255 S.W.2d 6, 7 (1953).

█ The State's power over alcoholic beverages rests with the General Assembly. Only the General Assembly may legalize the sale of alcoholic beverages, *Ewin v. Richardson,* 217 Tenn. 534, 539, 399 S.W.2d 318, 320 (1966); *Case v. Carney,* 213 Tenn. 597, 604, 376 S.W.2d 492, 495 (1964), and the General Assembly's power is limited only by the state and federal constitutions. *Fentress County Beer Bd. v. Cravens,* 209 Tenn. 679, 687, 356 S.W.2d 260, 263 (1962). If the General Assembly decides to legalize alcoholic beverages, it may delegate its power to control their sale and consumption. *Young v. Warren County Beer Bd.,* 195 Tenn. 211, 215, 258 S.W.2d 763, 765 (1953); *McCanless v. Klein,* 182 Tenn. 631, 638–39, 188 S.W.2d 745, 748 (1945).

After fourteen years of prohibition brought on by the Eighteenth Amendment to the United States Constitution, the General Assembly legalized the sale of beer in Tennessee even before the ratification of the Twenty–First Amendment.[2] It established a dual regulatory plan that left the taxing power to the State and the other regulatory powers to local governments. The local governments exercise their control over the sale of beer through their authority to issue permits to persons desiring to sell beer within their respective jurisdictions.

█ The local governments have primary control over the sale of beer. *State ex rel. Amvets Post 27 v. Beer Bd.,* 717 S.W.2d 878, 881 (Tenn.1986); *Claiborne Country Club, Inc. v. City of Tazewell,* 872 S.W.2d 685, 687 (Tenn.Ct.App.1993). Incorporated cities have greater control over the sale beer than counties. While counties are limited to enforcing the restrictions in state law, cities

Mun.Code ch. 2, § 2–213(4) prohibits making or allowing "any sale of beer to any person under twenty-one (21) years of age."

2. Congress proposed the Twenty–First Amendment to the states on February 20, 1933. One month later, the General Assembly provided for a limited convention to consider ratifying the Twenty–First Amendment. *See* Act of March 29, 1933, ch. 38, 1933 Tenn.Pub.Acts 53. Approximately two weeks after setting the ratification process in motion, the General Assembly legal-

ized the sale of beer. *See* Act of April 12, 1933, ch. 69, 1933 Tenn.Pub.Acts 153. The convention convened on August 11, 1933 and unanimously ratified the Twenty–First Amendment. Everett S. Brown, *Ratification of the Twenty–First Amendment to the Constitution of the United States* 379–85 (1938). The United States Secretary of State declared the Twenty–First Amendment ratified on December 5, 1933.

may impose additional restrictions on the sale of beer. *Howard v. Willocks,* 525 S.W.2d 132, 135 (Tenn.1975). The only limits placed on the cities' regulatory powers are found in the state and federal constitutions, the state statutes, and in the requirement that cities cannot exercise their power in an arbitrary or discriminatory manner. *Beer Bd. v. Brass A Saloon of Rivergate, Inc.,* 710 S.W.2d 33, 35 (Tenn.1986); *Pantry, Inc. v. City of Pigeon Forge,* 681 S.W.2d 23, 23–24 (Tenn.1984).

Tenn.Code Ann. § 57–5–301(b)(1) (Supp. 1994) provides that beer shall not be sold "between twelve (12:00) o'clock midnight on Saturday and eleven fifty-nine o'clock p.m. (11:59 p.m.) on Sunday." However, except for several circumstances not relevant in this case, the cities have the statutory prerogative to alter the hours of opening and closing, Tenn.Code Ann. § 57–5–106(a) (Supp.1994), and may even authorize the sale of beer on Sunday within their respective jurisdictions. Tenn.Code Ann. § 57–5–301(b)(3).

The Dickson City Council has enacted an ordinance governing the hours within which beer may be sold within the city limits. Dickson, Tenn., Mun.Code ch. 2, § 2–213(3) provides that permittees may not sell beer between midnight and 8:00 a.m. on any day of the week, on Sunday, or on election day while the polls are open. It is the portion of this ordinance prohibiting the sale of beer on Sunday that Mr. Martin asserts violates the prohibition against religious preferences in Tenn. Const. art. I, § 3 and the substantive due process provision in Tenn. Const. art. I, § 8.

### III.

#### THE CONSTITUTIONAL PROHIBITION AGAINST RELIGIOUS PREFERENCES

We turn first to the trial court's conclusion that Dickson's ordinance prohibiting the sale of beer on Sunday violates Tenn. Const. art. I, § 3 because it "operates to give preference to a specific religion." Prohibitions against drinking on Sunday may once have been entirely religiously motivated. They have now taken on a secular character and are not understood as conveying governmental approval of any particular religious belief. Accordingly, the ordinance does not cause the sort of entanglement between church and state that Tenn. Const. art. I, § 3 is intended to prevent.

### A.

Tennessee's constitutions have contained Religion Clauses ever since the earliest days of statehood. Despite their importance, these clauses have received relatively little judicial scrutiny. The Tennessee Supreme Court has noted in the most general terms that Tenn. Const. art. I, § 3 "guarantees freedom of worship and separation of church and state," *City of Nashville v. State Bd. of Equalization,* 210 Tenn. 587, 612 n. 5, 360 S.W.2d 458, 469 n. 5 (1962),[3] and that the separation between church and state is a constitutional imperative equal to the free exercise mandate. *Paty v. McDaniel,* 547 S.W.2d 897, 905 (Tenn.1977), *rev'd on other grounds,* 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978). Even though Tenn. Const. art. I, § 3 is "practically synonymous" with the First Amendment, *Carden v. Bland,* 199 Tenn. 665, 672, 288 S.W.2d 718, 721 (1956); *State v. Loudon,* 857 S.W.2d 878, 883 (Tenn.Crim.App.1993), the Court has also observed that it contains a substantially stronger guaranty of religious freedom than its federal counterpart. *State ex rel. Swann v. Pack,* 527 S.W.2d 99, 107, 111 (Tenn.1975), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976); *Carden v. Bland,* 199 Tenn. at 672, 288 S.W.2d at 721.

State constitutions embody fundamental values and articulate the citizens'

---

**3.** The United States Supreme Court has employed the concept of "separation between church and state" for over one hundred years. *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 122–23, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1982); *Reynolds v. United States,* 98 U.S. 145, 164, 25 L.Ed. 244, 249 (1879). The concept originated with Thomas Jefferson's explanation that the First Amendment built "a wall of separation between Church and State." Letter from Thomas Jefferson to the Danbury Baptist Assoc. (Jan. 1, 1802), *in* 8 *Writings of Thomas Jefferson* 113 (Henry A. Washington ed., 1861).

common aspirations for constitutional governance and the rule of law. Rather than stating inflexible specific rules of conduct, they contain broad principles capable of accommodating societal changes. *Cumberland Capital Corp. v. Patty,* 556 S.W.2d 516, 530 (Tenn.1977). Constitutional provisions gather meaning from the experience of the people. *National Mut. Ins. Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 646, 69 S.Ct. 1173, 1195, 93 L.Ed. 1556 (1949) (Frankfurter, J., dissenting). The courts should expect that modern society will mold and shape constitutional principles into new and useful forms.

■ The courts are society's chief expositors of constitutional principles. *Metropolitan Gov't v. Tennessee State Bd. of Equalization,* 817 S.W.2d 953, 955 (Tenn.1991); *LaFever v. Ware,* 211 Tenn. 393, 400, 365 S.W.2d 44, 47 (1963). Since constitutions derive their power and authority from the people, *The Judges' Cases,* 102 Tenn. 509, 520, 53 S.W. 134, 136 (1899); *Stratton Claimants v. Morris Claimants,* 89 Tenn. 497, 512–13, 15 S.W. 87, 90 (1891), our articulation of constitutional principles must capture the intentions of the persons who ratified the constitution. These intentions are reflected in the words of the constitution itself, *Hatcher v. Bell,* 521 S.W.2d 799, 803 (Tenn.1974); *Shelby County v. Hale,* 200 Tenn. 503, 510, 292 S.W.2d 745, 748 (1956), rather than our own subjective notions of unexpressed constitutional intent. *Luehrman v. Taxing Dist.,* 70 Tenn. 425, 438 (1879).

■ The courts must construe constitutional provisions reasonably, *Ashe v. Leech,* 653 S.W.2d 398, 401 (Tenn.1983), in light of the practices and usages that were wellknown when the provision was ratified.

*Peay v. Nolan,* 157 Tenn. 222, 230, 7 S.W.2d 815, 817 (1928). We must give the words used in a constitution their usual and ordinary meaning unless the context requires otherwise. *Gaskin v. Collins,* 661 S.W.2d 865, 867 (Tenn.1983). We must also consider these terms with reference to what the people who ratified the provision thought they meant. *State ex rel. Doyle v. Torrence,* 203 Tenn. 175, 182, 310 S.W.2d 425, 427–28 (1958).

■ Articulating constitutional principles, like any other interpretative exercise, may be aided by referring to external sources. A state constitution does not exist in isolation but rather is a unique historical document. While the text must always be the primary guide to the purpose of a constitutional provision, we should approach the text in a principled way that takes into account the history, structure, and underlying values of the document. Accordingly, Tennessee's courts have relied upon historical documents,[4] constitutional convention proceedings,[5] the proposed constitution of the State of Franklin,[6] other similar state and federal constitutional provisions,[7] and decisions from other jurisdictions construing similar provisions.[8]

### B.

Religious diversity has been part of our heritage since the first European settlers arrived in North America. Many of these early colonists came to America to escape religious persecution that took the form of forced support of state-established churches. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* —— U.S. ——, ——, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472 (1993); *Edwards v. Aguillard,* 482 U.S. 578, 605, 107 S.Ct. 2573, 2589, 96 L.Ed.2d 510 (1987) (Powell, J., concurring). The colonists valued reli-

---

**4.** *Cumberland Capital Corp. v. Patty,* 556 S.W.2d at 519–30.

**5.** *The Judges' Cases,* 102 Tenn. at 519–20, 53 S.W. at 136.

**6.** *State v. Marshall,* 859 S.W.2d 289, 303 (Tenn. 1993) (Reid, C.J., concurring); *Paty v. McDaniel,* 547 S.W.2d at 902.

**7.** *State v. Marshall,* 859 S.W.2d at 292; *State v. Deuter,* 839 S.W.2d 391, 395–96 (Tenn.1992); *State v. Loudon,* 857 S.W.2d at 883.

**8.** *Wright v. Cunningham,* 115 Tenn. 445, 463–64, 91 S.W. 293, 297 (1905).

gious freedom and reacted strongly when they perceived the same sort of religious intolerance emerging in this county.[9] Ac-. cordingly, their early state constitutions and declarations of rights contained provisions guaranteeing freedom of religion.[10]

The original version of the United States Constitution sent to the states for ratification in 1787 did not contain a bill of rights and did not otherwise address the issue of religious freedom. The public demand for protection of their rights was reflected in the various states' ratifying conventions. Most of these conventions called for the inclusion of a bill of rights in the United States Constitution and patterned their recommendations after their own constitutions and declarations of rights. Six states favored including a provision protecting religious freedom in the United States Constitution. Edward Dumbauld, *The Bill of Rights and What It Means Today* 161 (1957); *Wallace v. Jaffree,* 472 U.S. 38, 93, 105 S.Ct. 2479, 2509, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting).

The First Congress responded to the requests for recognition of religious freedom by including a specific provision concerning the exercise and establishment of religion in the twelve amendments it sent to the states in 1789.[11] In 1791 Virginia became the eleventh state to adopt ten of the twelve proposed amendments. Thereafter, the First Amendment to the United States Constitution provided, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

The drafters of Tennessee's first constitution, like their counterparts in other states, decided to include a declaration of rights in the Constitution of 1796. No direct evidence exists concerning the source or authorship of our first declaration of rights; however, its provisions generally reflect the prevailing political philosophy of the time. Both the speed with which the bill of rights was drafted [12] and its textual similarity with other declarations of rights indicate that its provisions were patterned after similar provisions in the United States Constitution and other state constitutions.[13]

Tenn. Const. of 1796, art. XI, § 3 provided:

That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; that no man can, of right, be compelled to attend, erect or support any place of worship, or to maintain any minister against his consent; that no human authority can, in any case whatever, control or interfere with the rights of conscience; and that *no preference shall ever*

9. At the beginning of the Revolutionary War, there were established churches in eight of the thirteen colonies and established religions in at least four of the remaining five. *Engel v. Vitale,* 370 U.S. 421, 427–28, 82 S.Ct. 1261, 1265, 8 L.Ed.2d 601 (1962); *see also* 2 James Kent, *Commentaries on American Law* *35–38.

10. *See* Del. Const. of 1776, art. XXIX, *reprinted in* 1 Francis N. Thorpe, *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies* 567–68 (1909) ("Thorpe"); Ga. Const. of 1777, art. LVI, *reprinted in* 2 Thorpe, *supra,* at 784; Md. Const. of 1776, Declaration of Rights, art. XXXII, *reprinted in* 3 Thorpe, *supra,* at 1689–90; Mass. Const. of 1780, Declaration of Rights, art. II, *reprinted in* 3 Thorpe, *supra,* at 1889; N.J. Const. of 1776, art. XIX, *reprinted in* 5 Thorpe, *supra,* at 2597–98; N.C. Const. of 1776, Declaration of Rights art XIX & Form of Government art. XXXIV, *reprinted in* 5 Thorpe, *supra,* at 2788, 2793; Pa. Const. of 1776, Declaration of Rights, art. II, *reprinted in* 5 Thorpe, *supra,* at 3082; S.C.

Const. of 1790, art. VIII, *reprinted in* 6 Thorpe, *supra,* at 3264; Va. Const. of 1776, Bill of Rights, § 16, *reprinted in* 7 Thorpe, *supra,* at 3814.

11. Accounts of the drafting and ratification of the Bill of Rights can be found in *Wallace v. Jaffree,* 472 U.S. at 91–97, 105 S.Ct. at 2508–11; *McGowan v. Maryland,* 366 U.S. 420, 438–42, 81 S.Ct. 1101, 1111–13, 6 L.Ed.2d 393 (1961).

12. The committee selected to draft the declaration of rights completed its task in three days.

13. The bodies drafting the new state constitutions and bills of rights between 1776 and 1800 often borrowed from each other. By the late eighteenth century, the form and substance of the various state constitutions and declarations of rights had fallen into a stereotyped pattern. Robert A. Rutland, *The Birth of the Bill of Rights 1776–1791,* at 13, 74 (reprint Northeastern Univ. Press 1991) (1955).

be given, by law, to any religious establishment or modes of worship.

The provision was not one of the four original provisions appearing for the first time in the declaration of rights in Tenn. Const. of 1796, art. XI. Like sixteen other provisions in Tenn. Const. art. XI, it was based on the Pennsylvania Constitution of 1790.[14]

Tennessee's Declaration of Rights has remained virtually unchanged for the past two centuries. *Waugh v. State,* 564 S.W.2d 654, 657 (Tenn.1978). Except for minor syntactic differences, Tenn. Const. art. I, § 3 is identical to its 1796 ancestor. It provides:

> That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; that no man can of right be compelled to attend, erect, or support any place of worship, or to maintain any minister against his consent; that no human authority can, in any case whatever, control or interfere with the rights of conscience; and that no preference shall ever be given, by law, to any religious establishment or mode of worship.

The language in Tenn. Const. art. I, § 3 prohibiting giving preferences to religious establishments or modes of worship resembles language that appears in many other state constitutions.[15]

## C.

■ Tenn. Const. art. I, § 3 and the First Amendment to the United States Constitution arise from the same constitutional milieu. Their respective prohibitions against giving a "preference ... by law, to any religious establishment or mode of worship" and against making laws "respecting an establish-

ment of religion" share a common purpose. They are intended to foreclose the establishment of a state or national religion similar to other eighteenth century systems. *Larkin v. Grendel's Den, Inc.,* 459 U.S. at 122, 103 S.Ct. at 510; 3 Joseph Story, *Commentaries on the Constitution of the United States* 728 (1833).

■ Neither the First Amendment nor Tenn. Const. art. I, § 3 require us to deny our religious heritage. *Lynch v. Donnelly,* 465 U.S. 668, 675–78, 104 S.Ct. 1355, 1360–61, 79 L.Ed.2d 604 (1984); *McDaniel v. Paty,* 435 U.S. 618, 638, 98 S.Ct. 1322, 1334, 55 L.Ed.2d 593 (1978) (Brennan, J., concurring); *School Dist. of Abington v. Schempp,* 374 U.S. 203, 213, 83 S.Ct. 1560, 1566, 10 L.Ed.2d 844 (1963); *Zorach v. Clauson,* 343 U.S. 306, 313–14, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952). Both provisions recognize the inevitability of some incidental overlapping between church and state. *Lynch v. Donnelly,* 465 U.S. at 672, 104 S.Ct. at 1359; *Walz v. Tax Comm'n,* 397 U.S. 664, 670, 90 S.Ct. 1409, 1412, 25 L.Ed.2d 697 (1970); *Covenant Community Church v. Lowe,* 698 S.W.2d 339, 341 (Tenn.1985). Thus, they do not require complete separation between government and religion.

■ The state and federal establishment clauses require the states to pursue a course of neutrality toward religion that does not favor one religion over another or religious adherents collectively over nonadherents. *Board of Educ. v. Grumet,* —— U.S. ——, ——, ——, 114 S.Ct. 2481, 2487, 2491, 129 L.Ed.2d 546 (1994). They require accommodation of all religions rather than hostility. *Lynch v. Donnelly,* 465 U.S. at 673, 104 S.Ct. at 1359; *McDaniel v. Paty,* 435 U.S. at 638,

---

14. Pa. Const. of 1790, art. IX, § 3 provided:
> That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; that no man can of right be compelled to attend, erect, or support any place of worship, or to maintain any ministry, against his consent; that no human authority can, in any case whatever, control or interfere with the rights of conscience; and that no preference shall ever be

given, by law, to any religious establishments or modes of worship.
*Reprinted in* 5 Thorpe, *supra,* at 3100.

15. *See, e.g.,* Ark. Const. art. II, § 24; Colo. Const. art. II, § 4; Kan. Const., Bill of Rights § 7; Minn. Const. art. I, § 16; Pa. Const. art. I, § 3; S.D. Const. art. VIII, § 16; Wis. Const. art. I, § 18.

98 S.Ct. at 1334 (Brennan, J., concurring). They do not require the invalidation of statutes that facilitate religion in general, *Board of Educ. v. Grumet,* —— U.S. at ——, 114 S.Ct. at 2492; *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 336–37, 107 S.Ct. 2862, 2869, 97 L.Ed.2d 273 (1987), or that indirectly and incidentally affect religious institutions. *Lynch v. Donnelly,* 465 U.S. at 691–92, 104 S.Ct. at 1369; *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 775, 93 S.Ct. 2955, 2967, 37 L.Ed.2d 948 (1973); *Paty v. McDaniel,* 547 S.W.2d at 904.

■ The extent of the required separation between church and state is blurred and indistinct and varies with the circumstances. *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971). Since constitutional neutrality cannot require an absolutely straight line, *Walz v. Tax Comm'n,* 397 U.S. at 669, 90 S.Ct. at 1411, the line between permissible and impermissible relationships can be no more straight and unwavering than due process can be defined in a single phrase or test. *Lynch v. Donnelly,* 465 U.S. at 678–79, 104 S.Ct. at 1362. The courts have declined to take a rigid, absolutist view of the Establishment Clause, *Lynch v. Donnelly,* 465 U.S. at 678, 104 S.Ct. at 1361, and have avoided drawing lines that sweep away all governmental recognition and acknowledgement of the role religion plays in citizens' lives. *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U.S. 573, 623, 109 S.Ct. 3086, 3117, 106 L.Ed.2d 472 (1989) (O'Connor, J., concurring).

■ The United States Supreme Court has declined to rely on any single criterion in its Establishment Clause analysis. *Lynch v. Donnelly,* 465 U.S. at 679, 104 S.Ct. at 1362. However, in order to prevent the wall of separation between church and state from becoming as winding as the serpentine wall Thomas Jefferson designed for the University of Virginia, *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. at 761, 93 S.Ct. at 2959, the Court has found it useful to examine the statute from three vantage points. In 1971, the Court stated that a statute would not run afoul of the Establishment Clause if (1) it has a secular purpose, (2) its principle or primary effect neither advances nor inhibits religion, and (3) it does not foster excessive governmental entanglement with religion. *Lemon v. Kurtzman,* 403 U.S. at 612–13, 91 S.Ct. at 2111. The statute must satisfy each of these inquiries in order to be found compatible with the Establishment Clause. *Edwards v. Aguillard,* 482 U.S. at 583, 107 S.Ct. at 2577; *Stone v. Graham,* 449 U.S. 39, 40–41, 101 S.Ct. 192, 193, 66 L.Ed.2d 199 (1980).

■ The *Lemon v. Kurtzman* criteria are guidelines to assist, rather than precise limits on, a court's decision-making process. *Meek v. Pittenger,* 421 U.S. 349, 358–59, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975). The Court has used the *Lemon v. Kurtzman* inquiries for the past two decades despite criticism from Justice O'Connor [16] and Justice Scalia.[17] In Establishment Clause cases where the Court has applied *Lemon v. Kurtzman,* Justice O'Connor would add a fourth inquiry.[18] Under her "endorsement analysis," she would also inquire "whether a

---

**16.** *Board of Educ. v. Grumet,* —— U.S. at ——–——, 114 S.Ct. at 2498–2500 (O'Connor, J., concurring); *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U.S. at 625, 109 S.Ct. at 3118 (O'Connor, J., concurring); *Lynch v. Donnelly,* 465 U.S. at 689–94, 104 S.Ct. at 1367–70 (O'Connor, J., concurring).

**17.** *Board of Educ. v. Grumet,* —— U.S. at ——, 114 S.Ct. at 2515 (Scalia, J., dissenting); *Edwards v. Aguillard,* 482 U.S. at 636, 107 S.Ct. at 2605 (Scalia, J., dissenting).

**18.** Justice O'Connor originally proposed a "fourth inquiry" as a refinement of the previously established *Lemon v. Kurtzman* inquiries. *See Lynch v. Donnelly,* 465 U.S. at 691–92, 104 S.Ct. at 1369. In more recent opinions, she has advocated the abandonment of the *Lemon v. Kurtzman* test as a unitary approach when it "does not reflect the special concerns" raised by a particular case. *Board of Educ. v. Grumet,* —— U.S. at ——, 114 S.Ct. at 2499. Despite her concerns regarding the *Lemon v. Kurtzman* principles, Justice O'Connor still agrees that they provide an appropriate analytical vehicle for evaluating cer-

reasonable observer would view such long-standing practices as a disapproval of his or her particular religious choices, in light of the fact that they serve a secular purpose rather than a sectarian one and have largely lost their religious significance over time." *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U.S. at 631, 109 S.Ct. at 3121; *see also Lynch v. Donnelly,* 465 U.S. at 692, 104 S.Ct. at 1369.

The Pennsylvania courts, like the Tennessee courts, have held that their constitutional prohibition against giving preferences to religious establishments shares a common purpose with the First Amendment's Establishment Clause. *Bishop Leonard Regional Catholic Sch. v. Unemployment Compensation Bd. of Review,* 140 Pa.Cmwlth. 428, 593 A.2d 28, 32 (1991). They have also held that their Religion Clause provides protections similar to those provided in the Establishment Clause. *Springfield Sch. Dist. v. Department of Educ.,* 483 Pa. 539, 397 A.2d 1154, 1170 (1979); *Wiest v. Mt. Lebanon Sch. Dist.,* 457 Pa. 166, 320 A.2d 362, 366–67 (1974). Accordingly, the Pennsylvania courts have used the *Lemon v. Kurtzman* inquiries to determine whether governmental conduct is inconsistent with their constitutional prohibition against religious preferences. *Springfield Sch. Dist. v. Department of Educ.,* 397 A.2d at 1157; *Bishop Leonard Regional Catholic Sch. v. Unemployment Compensation Bd. of Review,* 593 A.2d at 33; *Bishop Carroll High Sch. v. Commonwealth Unemployment Compensation Bd of Review,* 125 Pa.Cmwlth. 302, 557 A.2d 1141, 1146–47 (1989).

■ The Tennessee Supreme Court, like the Pennsylvania courts, has construed Tenn. Const. art. I, § 3 using the *Lemon v. Kurtzman* criteria. *Steele v. Waters,* 527 S.W.2d

72, 74 (Tenn.1975).[19] The Court also used the *Lemon v. Kurtzman* criteria ten years later in a case involving the First Amendment but not Tenn. Const. art. I, § 3. *Covenant Community Church v. Lowe,* 698 S.W.2d at 341. We find that the *Lemon v. Kurtzman* inquiries, supplemented by Justice O'Connor's endorsement inquiry, provide an appropriate method for determining whether a statute or ordinance violates Tenn. Const. art. I, § 3 or the First Amendment.

### D.

Tennessee inherited several Sunday laws from North Carolina. Two of these statutes provided that

> [a]ll and every person and persons whatsoever, shall on the Lord's day, commonly called Sunday, carefully apply themselves to the duties of religion and piety, and no tradesman, artificer, planter, laborer or other person whatsoever, shall, upon the land or water, do or exercise any labor, business or work of their ordinary callings, (works of necessity and charity only excepted,) nor employ themselves either in hunting, fishing or fowling, nor use any game, sport or play, on the Lord's day aforesaid, or any part thereof ...,

Chapter 14, § 2, North Carolina Session Laws of 1741, *in* 1 Statute Laws of the State of Tennessee 370 (John Haywood & Robert L. Cobbs, Knoxville, 1831), and that

> [e]very person convicted of drunkenness by view of any justice of the peace, confession of the party, or oath of one or more witness or witnesses, such person so convicted shall, if such offence was committed on the Lord's day, forfeit and pay the sum of *sixty-two and a half cents,* but if on any other day, the sum of *thirty-one and a fourth cents,* for each and every such offence.

tain categories of cases. *Board of Educ. v. Grumet,* —— U.S. at ——, 114 S.Ct. at 2500.

**19.** The United States Court of Appeals for the Sixth Circuit held that a Tennessee statute prescribing the contents of biology textbooks violated the Establishment Clause of the First Amendment. *Daniel v. Waters,* 515 F.2d 485, 489 (6th Cir.1975). In a related case, the Tennessee Supreme Court concurred with the United States Court of Appeals' decision and held that the statute also violated Tenn. Const. art. I, § 3 "for the same reasons." *Steele v. Waters,* 527 S.W.2d at 74.

Chapter 14, § 5, North Carolina Session Laws of 1741, *in* 1 Statute Laws of the State of Tennessee, *supra*, at 370. Tennessee eventually enacted its own statutes proscribing disturbing congregations assembled at public worship,[20] selling on Sunday,[21] selling "ardent spirits" within one mile of a place of worship,[22] and being drunk on Sunday.[23] The courts also adhered to the common law restriction against holding court on Sunday. *Styles v. Harrison*, 99 Tenn. 128, 128–29, 41 S.W. 333, 333 (1897).

There can be little doubt that these statutes were religiously motivated. In a case affirming a jury conviction for selling liquor on Sunday, the Tennessee Supreme Court noted:

> The object of the Legislature was to prevent the desecration of a day which by our law is dedicated to the duties of religion, by the sale of an article the use of which is calculated to produce the most shameless disregard of those duties.

*State v. Eskridge*, 31 Tenn. (1 Swan) 413, 415–16 (1852). Thereafter, the Court began to recognize that the Sunday closing laws also served secular purposes. The Court held that the statutes removed the opportunity for Sunday drinking. *Johnson v. Mayor, Etc., of City of Chattanooga*, 97 Tenn. 247, 250–51, 36 S.W. 1092, 1093 (1896). In a later case reversing a first-degree murder conviction because the trial judge charged the jury on Sunday, the Court held:

> Charging the jury is a high judicial function, and it cannot be lawfully exercised on Sunday.
>
> We so determine, not only in obedience to law, but with deep satisfaction as well,

since Sunday is one of the most useful institutions we possess. Aside from its religious aspects, it is a noble police regulation, greatly tending to preserve and increase the public health, affording as it does a stated time of rest from labor, and a means of physical and mental recuperation. On those who also regard and use it as a religious institution it bestows an additional benefit.

*Moss v. State*, 131 Tenn. 94, 110, 173 S.W. 859, 863 (1915); *see also Smith v. State*, 215 Tenn. 314, 318, 385 S.W.2d 748, 750 (1965).

### E.

Tennessee courts have consistently enforced Sunday closing laws[24] and statutes and ordinances prohibiting the sale of alcoholic beverages on Sunday.[25] They have not, however, specifically considered these statutes and ordinances in the context of an Establishment Clause or religious preference challenge. Other courts have repeatedly held that these laws do not cause an impermissible entanglement between government and religion.

The United States Supreme Court handed down a series of four opinions in 1961 upholding the constitutionality of Sunday closing laws. Its principal opinion addressed the issue of whether these laws provided a preference for Christian religions that conducted church services on Sunday. The Court held that "the 'Establishment Clause' does not ban federal or state regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions." *McGowan v. Maryland*, 366 U.S. at 442, 81 S.Ct. at 1113. The

20. Shannon's Code of Tennessee § 2566 (1896).

21. Shannon's Code of Tennessee §§ 2569, 3029 (1896).

22. Shannon's Code of Tennessee § 2567 (1896).

23. Shannon's Code of Tennessee § 3031 (1896).

24. *Graham v. State*, 134 Tenn. 285, 183 S.W. 983 (1916) (operating a motion picture theatre on Sunday); *Breyer v. State*, 102 Tenn. 103, 50 S.W.

769 (1899) (barbering on Sunday); *Parker v. State*, 84 Tenn. 476, 1 S.W. 202 (1886) (blacksmithing on Sunday).

25. *Johnson v. Mayor, Etc., of City of Chattanooga*, 97 Tenn. 247, 36 S.W. 1092 (1896); *McKinney v. Mayor, Etc., of City of Nashville*, 96 Tenn. 79, 33 S.W. 724 (1896); *McNeill v. State*, 92 Tenn. 719, 23 S.W. 52 (1893); *State v. Eskridge*, 31 Tenn. (1 Swan) 413 (1852).

Court noted that these laws were originally motivated by religion, *McGowan v. Maryland*, 366 U.S. at 431, 81 S.Ct. at 1108, but that they had taken on a more secular purpose which the Court described as "a uniform day of rest for all citizens." *McGowan v. Maryland*, 366 U.S. at 445, 81 S.Ct. at 1115; *see also Gallagher v. Crown Kosher Super Mkt. of Mass., Inc.*, 366 U.S. 617, 626, 81 S.Ct. 1122, 1127, 6 L.Ed.2d 536 (1961) (the statutes "have been divorced from the religious orientation of their predecessors"). The Court explained that

the State's purpose is not merely to provide a one-day-in-seven work stoppage. In addition to this, the State seeks to set one day apart from all others as a day of rest, repose, recreation and tranquility—a day which all members of the family and community have the opportunity to spend and enjoy together, a day on which there exists relative quiet and disassociation from the everyday intensity of commercial activities, a day on which people may visit friends and relatives who are not available during working days.

\* \* \* \* \* \*

Moreover, it is common knowledge that the first day of the week has come to have special significance as a rest day in this country. People of all religions and people with no religion regard Sunday as a time for family activity, for visiting friends and relatives, for late sleeping, for passive and active entertainments, for dining out, and the like.

*McGowan v. Maryland*, 366 U.S. at 450–52, 81 S.Ct. at 1118.

In two companion cases, the Court discussed whether Sunday closing laws impermissibly burdened religions that do not observe their sabbath on Sunday. The Court held that the Establishment Clause did not invalidate statutes that imposed only an indirect burden on the exercise of religion. *Braunfeld v. Brown*, 366 U.S. 599, 606, 81 S.Ct. 1144, 1147, 6 L.Ed.2d 563 (1961); *Gallagher v. Crown Kosher Super Mkt. of*

*Mass., Inc.*, 366 U.S. at 630–31, 81 S.Ct. at 1129. The Court explained that

to hold unassailable all legislation regulating conduct which imposes solely an indirect burden on the observance of religion would be a gross oversimplification. If the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect. But if the State regulates conduct by enacting a general law within its power, the purpose and effect of which is to advance the State's secular goals, the statute is valid despite its indirect burden on religious observance unless the State may accomplish its purpose by means which do not impose such a burden.

*Braunfeld v. Brown*, 366 U.S. at 607, 81 S.Ct. at 1148.

The Tennessee Supreme Court upheld the constitutionality of Sunday closing ordinances prior to the *McGowan v. Maryland* decision. *Kirk v. Olgiati*, 203 Tenn. 1, 5–6, 308 S.W.2d 471, 473 (1957). After the United States Supreme Court's 1961 decisions, the Tennessee Supreme Court specifically adopted *Braunfeld v. Brown's* "indirect burden" analysis. *Paty v. McDaniel*, 547 S.W.2d at 904–05. In its discussion of permissible secular goals, the Court alluded to the goal of "having everyone rest on the same day." *Paty v. McDaniel*, 547 S.W.2d at 905.

The state courts that have considered restrictions against Sunday sales of alcoholic beverages have uniformly found that they do not cause unconstitutional entanglement between church and state. *Shreveport Indep. Retail Grocers Ass'n v. City of Shreveport*, 367 So.2d 157, 160–61 (La.Ct.App.1979); *Pruey v. Department of Alcoholic Beverage Control*, 104 N.M. 10, 13, 715 P.2d 458, 461 (1986); *see also Silver Rose Entertainment, Inc. v. Clay County*, 646 So.2d 246, 252–53 (Fla.Dist.Ct.App.1994); *Russell v. Teton City*, 102 Idaho 348, 349, 630 P.2d 140, 141

(1981). Each of these cases emphasize the secularization of Sunday, the breadth of the government's power to regulate alcoholic beverages, and the secular reasons for prohibiting the sale of alcoholic beverages on Sunday.[26]

### F.

■ We now turn to Dickson's ordinance prohibiting the sale of beer on Sunday. The ordinance passes muster under Mr. Martin's Tenn. Const. art. I, § 3 challenge using the *Lemon v. Kurtzman* criteria augmented by Justice O'Connor's "endorsement analysis."

Neither Tenn. Const. art. I, § 3 nor the First Amendment to the United States Constitution prohibit all governmental acknowledgements of religion. Indeed, these acknowledgements are pervasive in Tennessee today. They take many familiar forms. Imprinted on our money is "In God We Trust." Our Pledge of Allegiance states that we are "one nation under God." Our House of Representatives and Senate begin their legislative sessions with a prayer; Good Friday, Thanksgiving Day, and Christmas Day are state holidays;[27] the Governor traditionally holds an annual prayer breakfast attended by the State's political, religious, and community leaders; and one of our five state songs describes Tennessee as a place "[w]here God has strewn with lavish hand, [m]ore natural beauty o'er the land."[28]

These acknowledgements and allusions to religion are not commonly understood as conveying the State's endorsement of or preference for a particular religion. They do not amount to an approval or disapproval of reasonable observer's religious choices. Their

"history and ubiquity," *Lynch v. Donnelly*, 465 U.S. at 693, 104 S.Ct. at 1369 (O'Connor, J., concurring), have caused these practices to take on a secular cast, and they are not understood as conveying governmental approval of particular religious beliefs.

Dickson's ordinance prohibiting the sale of beer on Sunday fits neatly into this category. While Sunday was originally a day of religious observance, the passage of time has converted it into a secular day for many citizens and has freed it from its exclusively religious origins. As the United States Supreme Court has noted, Sunday is a day set apart from all others, and it would be "unrealistic for enforcement purposes and perhaps detrimental to the general welfare to require a State to choose a common day of rest other than that which most persons would select of their own accord." *McGowan v. Maryland*, 366 U.S. at 452, 81 S.Ct. at 1119.

The General Assembly has recognized that the strict regulation of the sale of alcoholic beverages is consistent with society's health, safety, and welfare and has given the cities broad power to regulate the sale of beer. The cities have valid secular reasons for prohibiting the sale of beer on Sunday, including enhancing the safety of the travelling public, promoting domestic tranquility, shielding children from the effects of drinking, and accommodating the reduced number of law enforcement officers working on weekends. Prohibiting the sale of beer on Sunday neither advances nor inhibits religion, and a reasonable observer would not equate the adoption of such an ordinance as governmental approval or disapproval of his or her particular religious beliefs. Accordingly, we

---

**26.** The only reported decision using the Establishment Clause to invalidate a restriction on the sale of alcoholic beverages involved a Connecticut statute prohibiting the sale of alcoholic beverages on Good Friday. The Connecticut Supreme Court held that the passage of time had not converted Good Friday into a secular holiday and that the State had not articulated a secular purpose for singling out Good Friday as the only day during the year when alcoholic beverages

could not be sold. *Griswold Inn, Inc. v. Connecticut*, 183 Conn. 552, 441 A.2d 16, 20–21 (1981).

**27.** Tenn.Code Ann. § 15–1–101 (1992).

**28.** Francis H. Tranum's *My Tennessee* is Tennessee's official public school song. Tenn.Code Ann. § 4–1–302(3) (1991); Secretary of State, *Tennessee Blue Book 1991–1994*, at 394 (containing complete lyrics).

find that Dickson's ordinance prohibiting the sale of beer on Sunday is not a religious preference that violates Tenn. Const. art. I, § 3.

## IV.

### THE REASONABLENESS OF THE ORDINANCE

Mr. Martin also asserts that Dickson's ordinance violates the substantive due process provisions in Tenn. Const. art. I, § 8 and the Fourteenth Amendment of the United States Constitution. His arguments on this issue overlap his Tenn. Const. art. I, § 3 arguments. We find them without merit.

Tenn. Const. art. I, § 8 provides:

That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land.

It is similar to the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *State ex rel. Anglin v. Mitchell*, 596 S.W.2d 779, 786 (Tenn.1980). The Fourteenth Amendment's protections, however, establish a minimum level of constitutional protection, *Miller v. State*, 584 S.W.2d 758, 760 (Tenn.1979), and thus our state courts may interpret Tenn. Const. art. I, § 8 to provide greater protection than its federal counterpart. *Doe v. Norris*, 751 S.W.2d 834, 838 (Tenn.1988).

The courts do not use Tenn. Const. art. I, § 8 to inquire into the motives of a legislative body or to scrutinize the wisdom of a challenged statute or ordinance. *Braunfeld v. Brown*, 366 U.S. at 608, 81 S.Ct. at 1148; *Fritts v. Wallace*, 723 S.W.2d 948, 949–50 (Tenn.1987); *Brumley v. Town of Greeneville*, 38 Tenn.App. 322, 326, 274 S.W.2d 12, 14 (1954). Our inquiry is more limited. Unless a fundamental right is involved, our task is to review the statute or ordinance to determine whether it bears a reasonable relation to a proper legislative purpose and whether it is neither arbitrary

nor discriminatory. *Newton v. Cox*, 878 S.W.2d 105, 110 (Tenn.1994); *Neece v. City of Johnson City*, 767 S.W.2d 638, 639 (Tenn. 1989). Thus, it is not our prerogative to superimpose our personal opinions concerning the propriety of selling beer on Sunday on the Dickson City Council.

Mr. Martin does not have a fundamental right to sell beer on Sunday since selling alcoholic beverages is a privilege only. *Medley v. Maryville City Beer Bd.*, 726 S.W.2d 891, 892 (Tenn.1987); *Rivergate Wine & Liquors, Inc. v. City of Goodlettsville*, 647 S.W.2d 631, 633–34 (Tenn.1983). Thus, the only inquiry remaining is whether Dickson's ordinance is arbitrary and unreasonable.

The reasonableness of Dickson's ordinance must be evaluated with reference to state law and Dickson's other ordinances governing the sale of beer. The fact that other cities may have enacted different ordinances has no bearing on our inquiry. Thus, the possibility that other municipalities in Dickson County or elsewhere permit the sale of beer on Sunday does not render Dickson's ordinance invalid.

The courts presume that ordinances enacted in accordance with a local government's police power are valid and constitutional. *Rivergate Wine & Liquors, Inc. v. City of Goodlettsville*, 647 S.W.2d at 634. Thus, persons challenging an ordinance on substantive due process grounds have the burden of proving that the ordinance is not reasonably related to a valid governmental purpose. *Rivergate Wine & Liquors, Inc. v. City of Goodlettsville*, 647 S.W.2d at 634; *Fritts v. Wallace*, 723 S.W.2d at 950. Mr. Martin has not carried his burden in this case.

Tenn.Code Ann. § 57–5–301(b)(1) reflects the General Assembly's judgment that beer should not be sold on Sunday. However, the General Assembly has empowered the cities in Tenn.Code Ann. § 57–5–301(b)(3) to decide whether they will follow a similar

policy. Consistent with these laws, the Dickson City Council has chosen to retain the state prohibition against selling beer on Sunday. The prohibition applies uniformly throughout the city and does not discriminate among licensees. Accordingly, we find nothing arbitrary or unreasonable about Dickson's decision to prohibit the sale of beer on Sunday within its corporate limits.

## V.

### LENGTH OF THE PERMIT SUSPENSION

The beer board also takes issue with the trial court's decision to reduce the suspension of Mr. Martin's license from sixty to thirty days. The trial court did not explain the basis for its decision. We infer, however, that the reduction was based on the trial court's conclusion that Dickson, Tenn., Mun. Code ch. 2, § 2–213(3) was unconstitutional and that the trial court would not have reduced the suspension for other reasons had it found the ordinance constitutional. Since we have upheld the ordinance, the record contains *no basis* for reducing Mr. Martin's original suspension. Accordingly, we reverse the trial court's reduction of the suspension and reinstate the sixty-day suspension originally imposed by the beer board.

## VI.

We reverse the trial court's holding that Dickson, Tenn., Mun.Code ch. 2, § 2–213(3) violates Tenn. Const. art. I, § 3 or Tenn. Const. art. I, § 8 and remand the case to the trial court for the entry of an order upholding the beer board's sixty-day suspension of Mr. Martin's permit to sell beer. We also tax the costs of this appeal to James M. Martin for which execution, if necessary, may issue.

TODD, P.J., and LEWIS, J., concur.