IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
May 22, 2024 Session[1]

## HEATHER SMITH v. BLUECROSS BLUESHIELD OF TENNESSEE

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Hamilton County**
**No. 21-0938  Jeffrey M. Atherton, Chancellor**

———————————————————

**No. E2022-01058-SC-R11-CV**

———————————————————

In this appeal, we hold that the right to petition in the Tennessee Constitution is enforceable against governmental entities, not private parties, and that it cannot be the basis for a "public policy" exception to the employment-at-will doctrine as against private employers. Here, the plaintiff at-will employee emailed members of the Tennessee General Assembly expressing grievances about the COVID-19 vaccination mandate implemented by her employer, a private organization. After the employer told the plaintiff that the email violated the employer's policies, the employee sent a second similar email to legislators. The defendant terminated the plaintiff's employment. The plaintiff sued the defendant private employer for retaliatory discharge, asserting her employment was terminated for exercising the right to petition in Article I, Section 23 of the Tennessee Constitution. The trial court dismissed the complaint, and the Court of Appeals reversed. On appeal, our review shows that, for hundreds of years dating back to early England, the constitutional right to petition has been considered a bulwark against government oppression, not a constraint on private parties. No state in the nation has held that the right to petition applies to limit the ability of private employers to terminate the employment of at-will employees, and the language in Article I, Section 23 does not mandate such a holding. We hold that Article I, Section 23 is enforceable only against the government, not against private actors; consequently, private employers do not violate a clear public policy by terminating employees for exercising the right to petition. Thus, at-will employees may not base claims of retaliatory discharge against private employers on the right to petition in the Tennessee Constitution. Accordingly, we reverse the Court of Appeals and affirm the trial court's dismissal of the plaintiff's complaint.

---

[1] Oral argument was heard in this case at Tennessee Tech University in Cookeville, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Judgment of the Chancery Court Affirmed; Remanded to the Chancery Court**

HOLLY KIRBY, C.J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, ROGER A. PAGE, SARAH K. CAMPBELL, and DWIGHT E. TARWATER, JJ., joined. SARAH K. CAMPBELL, J., filed a separate concurring opinion.

Robert E. Boston, Joshua T. Wood, and David J. Zeitlin, Nashville, Tennessee, for the appellant, BlueCross BlueShield of Tennessee, Inc.

Stephen S. Duggins and Colson Duggins, Chattanooga, Tennessee, for the appellee, Heather Smith.

Stella Yarbrough, Nashville, Tennessee, and Bridget Lavender, New York, New York, for the amici curiae, American Civil Liberties Union Foundation of Tennessee and American Civil Liberties Union Foundation.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Heather Smith began her employment with Defendant BlueCross BlueShield of Tennessee, Inc. ("BlueCross") in January 2014.[2] BlueCross is a Tennessee non-profit corporation engaged in the business of providing health insurance.

In August 2021, in the midst of a global COVID-19 pandemic, BlueCross notified Ms. Smith that it had instituted a policy requiring public-facing employees to be vaccinated with the COVID-19 vaccine. Ms. Smith was not in a public-facing job position. But she reported to BlueCross director Allison Scripps, who told Ms. Smith that "as leaders, we are expected to follow the mandate." Ms. Smith was also told by BlueCross vice-president Clay Phillips, "[W]e now have a directive from our leadership team, and you need to accept it as such."

---

[2] This case is on appeal from a Tennessee Rule of Civil Procedure 12.02(6) motion to dismiss the complaint for failure to state a claim. *See* Tenn. R. Civ. P. 12.02(6). In reviewing a trial court's ruling on a motion to dismiss for failure to state a claim, we assume the truth of the factual allegations made in the complaint. *See Mynatt v. Nat'l Treasury Emps. Union, Chapter 39*, 669 S.W.3d 741, 745–46 (Tenn. 2023). Consequently, the facts recited in this opinion are from Ms. Smith's complaint and are taken as true for purposes of our analysis.

Ms. Smith did not get vaccinated with the COVID-19 vaccine. Instead, she sought to change job positions to avoid having BlueCross consider her—in Ms. Smith's view, wrongfully—a public-facing employee.[3] BlueCross denied Ms. Smith's request to change job positions.

BlueCross required Ms. Smith to disclose her vaccination status and submit any requests for religious accommodations relating to the vaccine mandate. On about September 13, 2021, Ms. Smith timely submitted a request for religious accommodation. On approximately September 27, BlueCross told Ms. Smith her request for religious accommodation had been rejected because BlueCross could not substantiate it. BlueCross gave Ms. Smith thirty more days to get vaccinated.

About two days later, Ms. Smith contacted BlueCross to ask what information it needed to substantiate her request for religious accommodation. BlueCross told Ms. Smith they did not need any more information and "would give her the benefit of the doubt." BlueCross then gave Ms. Smith a thirty-day extension to get vaccinated; it referred to the extension as an accommodation.

Ms. Smith offered BlueCross an alternative suggestion for accommodation, which was rejected. When she sought to appeal, she was told there was no right of appeal, so she accepted the thirty-day extension. Ms. Smith then applied for and obtained a new BlueCross job position that was not subject to the vaccination requirement.

Meanwhile, on October 27, 2021, the Tennessee General Assembly convened a special session for the purpose of addressing COVID-related issues. That same day, Ms. Smith emailed various Tennessee state legislators regarding her concerns and grievances about vaccine mandates and her requests for legislative action. On approximately October 28, one of the legislators read Ms. Smith's email aloud to a legislative committee. In the same time frame, a member of the General Assembly forwarded Ms. Smith's email to BlueCross. On November 3, BlueCross told Smith that her email to lawmakers violated BlueCross's social media policy.

On November 4, BlueCross instituted a new vaccine policy requiring all of its employees to obtain the COVID-19 vaccine. That same day, Ms. Smith sent another email to legislators. This one asked for legislative protection from vaccine mandates, and it specified that she was expressing her own opinions and not those of BlueCross. A member of the General Assembly forwarded Ms. Smith's second email to BlueCross.

---

[3] The complaint is not clear as to what BlueCross considered to be a "public-facing" job position.

The following day, BlueCross terminated Ms. Smith's employment. BlueCross told Ms. Smith it was terminating her employment because the email she sent to legislators violated BlueCross's social media policy.

On December 30, 2021, Ms. Smith filed a complaint against BlueCross for common-law retaliatory discharge in the Hamilton County Chancery Court. The complaint alleged that the termination of Ms. Smith's employment violated Tennessee's public policy, based on the right to petition in Article I, Section 23 of the Tennessee Constitution. The prayer for relief sought compensatory and punitive damages, and it asked the trial court to order BlueCross to reinstate Ms. Smith.

BlueCross filed a motion under Rule 12.02(6) of the Tennessee Rules of Civil Procedure to dismiss Ms. Smith's complaint for failure to state a claim. BlueCross argued its termination of Ms. Smith's employment was lawful under Tennessee's employment-at-will doctrine. It acknowledged Tennessee recognizes a public policy exception to the employment-at-will doctrine but argued the exception does not encompass Ms. Smith's claim. BlueCross contended the right to petition protects citizens from abusive government action but does not control relationships between private individuals, such as private at-will employment relationships. BlueCross asked the trial court to dismiss Ms. Smith's complaint for wrongful termination and retaliatory discharge claim as a matter of law.

In opposition to BlueCross's motion, Ms. Smith argued that, under the constitutional right to petition, "the court should protect the rights of Tennessee citizens and hold that the public policy exception to the at-will employment rule should be recognized as applying to communications with the legislature."

After a hearing, the trial court entered an order granting BlueCross's motion to dismiss.[4] The trial court acknowledged the matter presented "a dispute of first impression in Tennessee" and that "[n]either the parties nor the Court have found and presented a case that presents [Ms. Smith's] specific theory." The trial court declined to "recognize the right of citizens to communicate with legislators, as set forth in Article I, Section 23 of the

_____

[4] BlueCross's motion to dismiss attached three exhibits, including Ms. Smith's two emails to legislators. In its order granting BlueCross's motion, the trial court acknowledged "a portion of the matters before the Court included references by the parties to certain e-mail communications, internal policies, and perhaps other documents or discussions thereof." However, the trial court made it clear that, "consistent with Rule 12.02, the Court has not considered in its ruling the effect of those materials and has made its determination in light of the Complaint, as read most favorably to the pleading party." Therefore, we will review the trial court's order under the standard for reviewing a motion for dismiss for failure to state a claim.

Tennessee Constitution, as one of the clearly established public policies for which there is an exception to the doctrine of at-will employment."[5]

Ms. Smith appealed to the Court of Appeals. *Smith v. Bluecross Blueshield of Tenn.*, No. E2022-01058-COA-R3-CV, 2023 WL 3903385, at *4 (Tenn. Ct. App. June 9, 2023), *perm. app. granted*, (Tenn. Nov. 20, 2023). The Court of Appeals reversed the trial court. *Id.* at *9. It held that the right to petition is a public policy exception to the employment-at-will doctrine and applies to private employers like BlueCross. *Id.* at *7. Based on the allegations in the complaint, the appellate court held that Ms. Smith stated a claim that she was "fired for engaging in public-policy-linked conduct, namely exercising her right to petition." *Id.* at *9.

This Court granted BlueCross's application for permission to appeal to consider whether the Court of Appeals erred in holding that BlueCross violated a clear public policy evidenced by a constitutional provision by terminating Ms. Smith's employment for exercising her right to petition under Article I, Section 23 of the Tennessee Constitution.[6]

### STANDARD OF REVIEW

This is an appeal from the trial court's grant of a motion to dismiss for failure to state a claim upon which relief can be granted. *See* Tenn. R. Civ. P. 12.02(6). A Rule 12.02(6) motion "challenges 'the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence.'" *Mynatt*, 669 S.W.3d at 746 (quoting *Webb v. Nashville Area Habitat for Human.*, 346 S.W.3d 422, 426 (Tenn. 2011)); *see Leach v. Taylor*, 124 S.W.3d 87, 90 (Tenn. 2004) ("A Rule 12.02(6) motion to dismiss admits the truth of all of the relevant and material allegations contained in the complaint, but it asserts that the allegations fail to establish a cause of action."). Our review of a dismissal under Rule 12.02 requires us "to take the relevant and material factual allegations in the complaint as true and to construe liberally all allegations in favor of the plaintiff." *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 894 (Tenn. 2011). We review the trial court's legal conclusions "de novo without any presumption of correctness." *Leach*, 124 S.W.3d at 90 (citing *White v. Revco Disc. Drug Ctrs., Inc.*, 33 S.W.3d 713, 718 (Tenn. 2000)).

---

[5] The trial court commented that it would be inclined to recognize such a public policy exception to the employment-at-will doctrine, but concluded that, as a trial court, it did not have authority to do so.

[6] BlueCross stated the issue on appeal as: "Whether the Court of Appeals erred when it created a new public policy exception to the employment-at-will doctrine not recognized by or otherwise linked to action by the Tennessee General Assembly." Ms. Smith stated it as: "Whether the Court of Appeals was correct when it recognized that the public policy exception to the general at-will employment doctrine in Tennessee protects employees who exercise their Right to Petition—as enshrined in the Tennessee Constitution—by communicating with their legislators."

**ANALYSIS**

In this appeal, the plaintiff at-will employee seeks to assert a cause of action against a private employer for retaliatory discharge for exercising her rights under Article I, Section 23 of the Tennessee Constitution, commonly called the right to petition.[7] To analyze the issue on appeal, we first provide a brief overview of the employment-at-will doctrine and retaliatory discharge, and then discuss the right to petition under the federal Constitution, as well as the constitutions of other states. Against that backdrop, we consider whether Article I, Section 23 of the Tennessee Constitution is enforceable against private parties, and whether BlueCross violated any clear public policy evidenced by the Tennessee Constitution by terminating Ms. Smith for exercising her right to petition.

## I. Employment at Will

We begin with the doctrine of employment at will. Tennessee has recognized the doctrine since at least the late 1800s.[8] It is considered "a bedrock of Tennessee common law." *Williams v. City of Burns*, 465 S.W.3d 96, 108 (Tenn. 2015) (quoting *Franklin v. Swift Transp. Co.*, 210 S.W.3d 521, 527 (Tenn. Ct. App. 2006)). Indeed, the doctrine of employment at will "is the fundamental principle controlling the relationship between employers and employees." *Mason v. Seaton*, 942 S.W.2d 470, 474 (Tenn. 1997).

Under that doctrine, employment for an indefinite period may be terminated by either the employer or the employee at any time, for any reason, or for no reason at all. *Williams*, 465 S.W.3d at 108 (citing *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 26–27 (Tenn. 2011); *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 534–35 (Tenn. 2002)). The employment-at-will doctrine "recognizes that employers need the freedom to make their own business judgments without interference from the courts." *Mason*, 942 S.W.2d at 474. "[A]n employer's ability to make and act upon independent assessments of an employee's abilities and job performance as well as business needs is essential to the free-enterprise system." *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 (Tenn. 1997) (quoting *Clifford v. Cactus Drilling Corp.*, 353 N.W.2d 469, 474 (Mich. 1984) (Williams,

---

[7] Article I, Section 23 provides: "That the citizens have a right, in a peaceable manner, to assemble together for their common good, to instruct their representatives, and to apply to those invested with the powers of government for redress of grievances, or other proper purposes, by address or remonstrance." Tenn. Const. art. I, § 23.

[8] *Payne v. W. & Atl. R.R.*, 81 Tenn. 507, 519–20 (1884) ("All may dismiss their employes at will, be they many or few, for good cause, for no cause or even for cause morally wrong, without being thereby guilty of legal wrong."), *overruled on other grounds by Hutton v. Watters*, 179 S.W. 134, 137 (Tenn. 1915).

- 6 -

C.J., dissenting)).  Likewise, at-will employees have the right to refuse to work for a person or organization.  *Keller v. Casteel*, 602 S.W.3d 351, 358 (Tenn. 2020) (citing *Crews v. Buckman Lab'ys Int'l, Inc*., 78 S.W.3d 852, 858 (Tenn. 2002)).

This traditional rule, however, is not absolute; some restrictions have been imposed on the right of employers to discharge an employee.  *Williams*, 465 S.W.3d at 108 (citing *Guy*, 79 S.W.3d at 535).  As one of the exceptions to the employment-at-will doctrine, Tennessee recognizes a common-law tort of retaliatory discharge.  *Id*. at 108–09 (citing *Chism v. Mid–South Milling Co*., 762 S.W.2d 552, 556 (Tenn. 1988);[9] *Clanton v. Cain–Sloan Co*., 677 S.W.2d 441, 444–45 (Tenn. 1984)).  Under this exception, "an at-will employee 'generally may not be discharged for attempting to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy which is evidenced by an unambiguous constitutional, statutory, or regulatory provision.'"  *Crews*, 78 S.W.3d at 858 (quoting *Stein*, 945 S.W.2d at 717).

Our Court has explained that, to prove a common-law retaliatory discharge claim, the plaintiff must show (1) that an employment-at-will relationship existed; (2) that she was discharged; (3) that the reason for her discharge was that she attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge her was her exercise of protected rights or her compliance with clear public policy. *Id*. at 862.[10]

The earliest Tennessee cases recognizing retaliatory discharge have emphasized that it is an important, but narrow, exception to the employment-at-will doctrine.  *See, e.g*., *Chism*, 762 S.W.2d at 556.  Our courts have underscored the qualified nature of the cause of action, noting that retaliatory discharge is applicable only "in limited circumstances, [where] certain well-defined, unambiguous principles of public policy confer upon employees implicit rights which must not be circumscribed or chilled by the potential of termination."  *Franklin*, 210 S.W.3d at 530–31 (quoting *Stein*, 945 S.W.2d at 717).  The

---

[9] Two years after *Chism*, the legislature partially codified the retaliatory discharge cause of action by enacting the Tennessee Public Protection Act, which allows an employee to bring a cause of action against his or her employer when the employee is "discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities."  Tenn. Code Ann. § 50-1-304(a) (1990); *see Williams*, 465 S.W.3d at 110 & n.11.

[10] Claims of common-law retaliatory discharge are available only to private-sector employees; they are "not available to public employees in Tennessee because Tennessee's Legislature did not remove sovereign immunity for such actions."  *Williams*, 465 S.W.3d at 110 n.12 (citing *Guy*, 79 S.W.3d at 537).  Tennessee public employees instead may assert similar claims under the Tennessee Public Protection Act, codified at Tennessee Code Annotated section 50-1-304.  *Id*. at 109–10.

narrow exception for retaliatory discharge "cannot be permitted to consume or eliminate the general rule" of employment at will. *Chism*, 762 S.W.2d at 556.

## II. Constitutional Right to Petition

To determine whether a private employer who terminates an at-will employee for exercising her right to petition violates a "clear public policy" evidenced by the Tennessee Constitution, *Crews*, 78 S.W.3d at 858, we focus first on whether Article I, Section 23 of the Tennessee Constitution is enforceable against private entities.

"State constitutions embody fundamental values and articulate the citizens' common aspirations for constitutional governance and the rule of law." *Martin v. Beer Bd.*, 908 S.W.2d 941, 946–47 (Tenn. Ct. App. 1995). To interpret the text of a constitutional provision, we ask "what the people who voted for th[e] constitutional [provision] would think that the language meant." *State ex rel. Doyle v. Torrence*, 310 S.W.2d 425, 427–28 (Tenn. 1958). In addition, this Court has recognized:

> Articulating constitutional principles, like any other interpretative exercise, may be aided by referring to external sources. A state constitution does not exist in isolation but rather is a unique historical document. While the text must always be the primary guide to the purpose of a constitutional provision, we should approach the text in a principled way that takes into account the history, structure, and underlying values of the document.

*Cleveland Surgery Ctr., L.P. v. Bradley Cnty. Mem'l Hosp.*, 30 S.W.3d 278, 282 (Tenn. 2000) (quoting *Martin*, 908 S.W.2d at 947). Consequently, to interpret our Constitution, Tennessee courts have looked not only to historical context, but also to "other similar state and federal constitutional provisions, and decisions from other jurisdictions construing similar provisions." *Id*. (quoting *Martin*, 908 S.W.2d at 947).

### A. Historical context

The right to petition, "an essential safeguard of freedom, is of ancient significance in the English law and the Anglo-American legal tradition." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 395 (2011). Its origins can be traced "to Magna Carta, which confirmed the right of barons to petition the King" in 1215 A.D.[11] *Id*. (citing W.

---

[11] Paragraph 61 of Magna Carta granted the barons, in part, the following:

[W]e give and grant [the barons] the following security: namely, that the barons shall choose any twenty-five barons of the realm they wish, who with all their might are to observe, maintain and

McKechnie, *Magna Carta: A Commentary on the Great Charter of King John* 467 (rev. 2d ed. 1958)).  In the ensuing years, "[p]etitioning came to be regarded as part of the . . . fabric of political customs which defined English rights."  Gregory A. Mark, *The Vestigial Constitution: The History and Significance of the Right to Petition*, 66 Fordham L. Rev. 2153, 2169 (1998).

The seventeenth century is "key to understanding the centrality of petitioning in English constitutional thought."  *Id.* at 2170.  During that period, there were many upheavals, including civil war, and the King began to prosecute people for exercising their right to petition.  Norman B. Smith, *"Shall Make No Law Abridging...": An Analysis of the Neglected, but Nearly Absolute, Right of Petition*, 54 U. Cin. L. Rev. 1153, 1159–61 (1986).  By that time, "monarchial challenge to a petition could be, and was, defended on the basis that petitioning was an ancient right."  Mark, *supra*, at 2169.

Ultimately, the monarch's unfavorable reaction to petitions strengthened the right, and "petitioners' immunities were refined."  *Id*. at 2171.  The Glorious Revolution of 1688 and the 1689 English Bill of Rights confirmed the right to petition as an element of the British Constitution.  Smith, *supra*, at 1160; *see Richards Furniture Corp. v. Bd. of Cnty. Comm'rs*, 196 A.2d 621, 626 (Md. 1963) (citing Corwin, Constitution, United States, 82 Congress, 2d Session Senate Document No. 170, p. 805)).

These events show that, during this time in England, the right to petition was understood as freedom to seek redress for grievances without reprisal from the British government:

> From its inception in the thirteenth century and for approximately 500 years thereafter, petitioning was not a meaningful right because petitioners were frequently punished.  Even when petitioning was legitimized through written guarantees during that period, the right was not always tolerated in practice. . . .

---

cause to be observed the peace and liberties which we have granted and confirmed to them by this our present charter; so that if we or our justiciar or our bailiffs or any of our servants offend against anyone in any way, or transgress any of the articles of peace or security, and the offence is indicated to four of the aforesaid twenty-five barons, those four barons shall come to us or our justiciar, if we are out of the kingdom, and shall bring it to our notice and ask that we have it redressed without delay.

Gregory A. Mark, *The Vestigial Constitution: The History and Significance of the Right to Petition*, 66 Fordham L. Rev. 2153, 2164 n.29 (1998) (quoting Manuscript Cii of Magna Carta (1215) (translation from text compiled by C. Bemont, Chartes des libertes anglaises (1892)).

In England, the presence of a strong monarchy had always allowed the British government to suppress petitioners. Over time, the ascendancy of Parliament counterbalanced the sovereign's power. Petitioners did not immediately gain from this shift in power—they were simply punished by a different branch of government, namely Parliament.

Julie M. Spanbauer, *The First Amendment Right to Petition Government for A Redress of Grievances: Cut from A Different Cloth*, 21 Hastings Const. L.Q. 15, 19–20 (1993) (internal footnotes omitted).

Thus, the right to petition ultimately "became part of the law of England." *Guarnieri*, 564 U.S. at 395 (citing S. Gardiner, *The First Two Stuarts and the Puritan Revolution, 1603–1660*, pp. 60–61 (1886)). "The Petition of Right occupies a place in English constitutional history superseded in importance, perhaps, only by Magna Carta itself and the Declaration of Right of 1689."[12] *Id*.

American colonists sought to replicate the most important liberties of their English heritage, including the right to petition. Mark, *supra*, at 2174. The right was affirmed in both pre-Revolutionary declarations and pre-union state constitutions.[13] Smith, *supra*, at 1173, 1181; Mark, *supra*, at 2177.

For example, the Stamp Act Congress of 1765, convened to protest Britain's imposition of the Stamp Act, included in its Declaration of Rights and Grievances that it was "the right of the British subjects in these colonies to petition the King or either House of Parliament." Smith, *supra*, at 1173 (quoting 1 Bernard Schwartz, *The Bill of Rights: A Documentary History* 196–98 (1971)). In 1774, the Declaration and Resolves of the First Continental Congress stated that the colonists had "a right peaceably to assemble, consider

---

[12] Our Court of Appeals has summarized the historical importance of the right to petition:

> Under Magna Carta, noblemen petitioned the king to secure their rights. Parliament used the Petition of Right to "gain popular rights from the king," and the people eventually "used petitioning as the means to secure their own rights against parliament." Thus, "[t]he development of petitioning is inextricably linked to the emergence of popular sovereignty."

*Gentry v. Former Speaker of House Glen Casada*, No. M2019-02230-COA-R3-CV, 2020 WL 5587720, at *3 (Sept. 17, 2020) (alteration in original) (internal citations omitted) (quoting Smith, *supra,* at 1153).

[13] The earliest codification of petitioning was in the Massachusetts Body of Liberties in 1641. Mark, *supra*, at 2177 (quoting A Coppie of the Liberties of the Massachusetts Collonie in New England (Dec. 1641), *reprinted in* 1 *Documents on Fundamental Human Rights: The Anglo-American Tradition* 122, 124 (Zechariah Chafee, Jr. ed., 1963)).

of their grievances, and petition the King; and that all prosecutions, prohibitory proclamations, and commitments for the same, are illegal." *Id.* at 1174 (quoting Schwartz, *supra*, at 217). And the Declaration of Independence of 1776 asserted, "In every stage of these Oppressions We have Petitioned for Redress in the most humble terms: Our repeated Petitions have been answered only by repeated injury." *Guarnieri*, 564 U.S. at 396 (quoting The Declaration of Independence para. 30 (U.S. 1776)). "As the[se] declarations suggest, the patriots understood their right to petition as protection from reprisals by the Crown." James E. Pfander, *Sovereign Immunity and the Right to Petition: Toward A First Amendment Right to Pursue Judicial Claims Against the Government*, 91 Nw. U. L. Rev. 899, 903 n.16 (1997).[14]

Beginning in 1776, before ratification of the Bill of Rights in the federal Constitution, many individual state constitutions incorporated a right to petition into their declarations of rights. *See* Smith, *supra*, at 1174 (listing states). The state bills of rights inspired the drafting of the federal bill of rights. *See* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 501 (1977).

Like its state predecessors, the Bill of Rights to the federal Constitution, ratified in 1791, included a right to petition. *See* Smith, *supra*, at 1175. The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech,

---

[14] Courts have explained the right to petition, as understood by the American Colonists, in the context of official persecution of those who expressed grievances to the government:

[T]he meaning of the 'right to petition the Legislature for redress of grievances' can best be understood in the context of the pre-Revolutionary period between the enactment of the Stamp Act in 1765 and the Declaration of Independence by the Colonies in 1776. The celebrated trial in 1734 of John Peter Zenger, the newspaper editor and pamphleteer, for seditious libel had shown the colonists the fate to be expected by outspoken critics of British policy. The suppression by the British of written and spoken criticism by the Colonists of British colonial policies was one of the real fears of the period. And the rights of the Colonists, as Englishmen, to the freedom of speech, press, assembly and petition were among the most cherished rights of the citizens of that time. It was in the light of this background that the framers of the Declarations of Rights of the original States and the Bill of Rights of the Federal Constitution drafted the provisions relating to the 'right to petition' the legislative branch of the government.

*Richards Furniture Corp.*, 196 A.2d at 626 (internal citations omitted); *e.g.*, *Guarnieri*, 564 U.S. at 395–97.

or of the press; or the right of the people peaceably to assemble, and *to petition the Government for a redress of grievances*.

U.S. Const. amend. I (emphasis added).  The framers of the U.S. Constitution were aware of the events of England that led to the English Bill of Rights, and they used that document "as a model for the petition clause of the first amendment."  Smith, *supra*, at 1181 (citing A. Weinberger, *Freedom and Protection—The Bill of Rights* 10 (1962)).

Against this backdrop, Tennessee's first constitution, adopted in 1796, included the right to petition.  *See* Tenn. Const. art. XI, § 22 (1796). Our constitution has retained the same language ever since.  *See* Tenn. Const. art. I, § 23 (1834); Tenn. Const. art I., § 23 (1870).  The right to petition is currently contained in Article I, Section 23:

> That the citizens have a right, in a peaceable manner, to assemble together for their common good, to instruct their representatives, and to apply to those invested with the powers of government for redress of grievances, or other proper purposes, by address of remonstrance.

Tenn. Const. art. I, § 23.

### B. Enforcing federal right to petition against private parties

Notably, the right to petition in the First Amendment to the federal Constitution is framed in terms of prohibiting Congressional action infringing upon it: "Congress shall make no law . . . abridging . . . the right of the people peaceably to. . . petition the Government for a redress of grievances."  U.S. Const. amend. I.

It is perhaps unsurprising, then, that courts construing the federal Constitution have held that, "to elicit First Amendment protection, the infringement upon speech or petition rights must have 'arisen from state action of some kind.'"  *Sharp Corp. v. Hisense USA Corp.*, 292 F. Supp. 3d 157, 175 (D.D.C. 2017), *appeal dismissed per stipulation*, No. 17-7158, 2017 WL 9401061 (D.C. Cir. Dec. 26, 2017) (quoting *Bronner v. Duggan*, 249 F. Supp. 3d 27, 41 (D.D.C. 2017)); *see Hudgens v. N.L.R.B.*, 424 U.S. 507, 513 (1976) ("It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state.").  Private entities are "not ordinarily constrained by the First Amendment."  *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 812 (2019).

And so, "while statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free

expression of others, no such protection or redress is provided by the Constitution itself." *Hudgens*, 424 U.S. at 513. Absent state action, courts will "not intervene when a private employer fires employees in retaliation for their exercise of First Amendment rights." Lisa B. Bingham, *Employee Free Speech in the Workplace: Using the First Amendment as Public Policy for Wrongful Discharge Actions*, 55 Ohio St. L.J. 341, 348–49 (1994) (citing *Black v. Cutter Lab'ys*, 351 U.S. 292 (1956); *Rendell-Baker v. Kohn*, 457 U.S. 830, 837–43 (1982)); *see Manson v. Little Rock Newspapers, Inc.*, 200 F.3d 1172, 1173 (8th Cir. 2000) ("Simply put, the defendant is a private entity, not a governmental entity, and thus is legally incapable of violating anyone's First Amendment rights."); *cf. Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (noting that "private employers[] need a significant degree of control over their employees' words and actions.").

## C. Right to petition in other states

Including Tennessee, forty-eight states have provisions in their constitutions granting a right to petition.[15] Seven of the right-to-petition provisions in these state constitutions have language akin to the federal Constitution, explicitly prohibiting *government* infringement on the right.[16] The remaining forty-one do not.[17] *E.g.*, *compare*

---

[15] *See* Ala. Const. art. I, § 25; Alaska Const. art. I, § 6; Ariz. Const. art. II, § 5; Ark. Const. art. II, § 4; Cal. Const. art. I, § 3; Colo. Const. art. II, § 24; Conn. Const. art I. § 14; Del. Const. art. I, § 16; Fla. Const. art. I, § 5; Ga. Const. art. I, § 1, para. IX; Haw. Const. art. I, § 4; Idaho Const. art. I, § 10; Ill. Const. art. I, § 5; Ind. Const. art. I, § 31; Iowa Const. art. I, § 20; Kan. Const. Bill of Rights § 3; Ky. Const. § 1; La. Const. art. I, § 9; Me. Const. art. I, § 15; Md. Const. Declaration of Rights, art. 13; Mass. Const. pt. I, art. XIX; Mich. Const. art. I, § 3; Miss. Const. art. III, § 11; Mo. Const. art. I, § 9; Mont. Const. art. II, § 6; Neb. Const. art. I, § 19; Nev. Const. art. I, § 10; N.H. Const. pt. I, art. XXXII; N.J. Const. art. I, para. 18; N.Y. Const. art. I, § 9; N.C. Const. art. I, § 12; N.D. Const. art. I, § 5; Ohio Const. art. I, § 3; Okla. Const. art. II, § 3; Or. Const. art. I, § 26; Pa. Const. art. I, § 20; R.I. Const. art. I, § 21; S.C. Const. art. I, § 2; S.D. Const. art. VI, § 4; Tenn. Const. art. I, § 23; Tex. Const. art. I, § 27; Utah Const. art. I, § 1; Vt. Const. ch. I, art. XX; Va. Const. art. I, § 12; Wash. Const. art. I, § 4; W. Va. Const. art. III, § 16; Wis. Const. art. I, § 4; Wyo. Const. art. I, § 21.

[16] *See* Haw. Const. art. I, § 4; Ind. Const. art. I, § 31; La. Const. art. I, § 9; N.Y. Const. art. I, § 9; Or. Const. art. I, § 26; S.C. Const. art. I, § 2; Va. Const. art. I, § 12.

[17] *See* Ala. Const. art. I, § 25; Alaska Const. art. I, § 6; Ariz. Const. art. II, § 5; Ark. Const. art. II, § 4; Cal. Const. art. I, § 3(a); Colo. Const. art. II, § 24; Conn. Const. art I. § 14; Del. Const. art. I, § 16; Fla. Const. art. I, § 5; Ga. Const. art. I, § 1, para. IX; Idaho Const. art. I, § 10; Ill. Const. art. I, § 5; Iowa Const. art. I, § 20; Kan. Const. Bill of Rights, § 3; Ky. Const. § 1; Me. Const. art. I, § 15; Md. Const. Declaration of Rights, art. 13; Mass. Const. pt. I, art. XIX; Mich. Const. art. I, § 3; Miss. Const. art. III, § 11; Mo. Const. art. I, § 9; Mont. Const. art. II, § 6; Neb. Const. art. I, § 19; Nev. Const. art. I, § 10; N.H. Const. pt. I, art. XXXII; N.J. Const. art. I, para. 18; N.C. Const. art. I, § 12; N.D. Const. art. I, § 5; Ohio Const. art. I, § 3; Okla. Const. art. II, § 3; Pa. Const. art. I, § 20; R.I. Const. art. I, § 21; S.D. Const. art. VI, § 4; Tenn. Const.

La. Const. art. I, § 9 ("No law shall impair the right of any person to assemble peaceably or to petition government for a redress of grievances."), *with* N.C. Const. art. I, § 12 ("The people have a right . . . to apply to the General Assembly for redress of grievances[.]").

Relatively few of these states have addressed whether their constitutional right to petition is enforceable against private parties, and all of the cases arose in a context dissimilar to this case, namely, right-to-petition claims asserted against private property owners. *E.g.*, *Woodland v. Mich. Citizens Lobby*, 378 N.W.2d 337, 338 (Mich. 1985) ("[Citizens] sought to engage in the solicitation of signatures for an initiative petition in the mall areas of privately owned shopping centers, over the objection of their owners, claiming that the denial or restriction of this activity is violative of the Michigan Constitution."). Of the states that have addressed the issue, as detailed below, the majority conclude that their state's constitutional right to petition is only enforceable against the government, and not against private parties.[18] *See Cologne v. Westfarms Assocs*, 469 A.2d 1201, 1202 (Conn. 1984) (holding Connecticut's constitutional rights of free speech and petition may not be exercised on private property contrary to the wishes of its owners);[19] *Citizens for Ethical Gov't, Inc. v. Gwinnett Place Assocs., L.P.*, 392 S.E.2d 8, 9 (Ga. 1990) (rejecting appellants' claim that the constitutional right to petition in Georgia "create[s] a constitutional right of access to private property for political activity"); *Woodland*, 378 N.W.2d at 348 (holding Michigan's constitutional guarantees of free speech, assembly, and petition are not applicable to private parties); *W. Pa. Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co.*, 515 A.2d 1331, 1332–33 (Pa. 1986) ("We believe that the Pennsylvania Constitution does not guarantee access to private property for the exercise of [free speech and petition] rights.").[20]

---

art. I, § 23; Tex. Const. art. I, § 27; Utah Const. art. I, § 1; Vt. Const. ch. I, art. XX; Wash. Const. art. I, § 4; W. Va. Const. art. III, § 16; Wis. Const. art. I, § 4; Wyo. Const. art. I, § 21.

[18] California is the only state to hold the opposite. It has held that the right-to-petition provision in its constitution is enforceable against certain privately-owned businesses held open to the public, and that it requires the property owners to allow the solicitation of signatures for political petitions on their property. *See Robins v. Pruneyard Shopping Ctr.*, 592 P.2d 341, 347 (Cal. 1979), *aff'd*, 447 U.S. 74 (1980) ("We conclude that sections 2 and 3 of article I of the California Constitution protect speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned.").

[19] The Connecticut legislature later adopted a statute granting employees a cause of action against private employers who discharge an employee for, *inter alia*, exercising the right to petition. Conn. Gen. Stat. Ann. § 34-51 (1983). *See also Cotto v. United Techs. Corp.*, 738 A.2d 623, 632 (Conn. 1999) (holding the statute's protections extend into the private workplace).

[20] The American Civil Liberties Union and the American Civil Liberties Union of Tennessee cite another Pennsylvania case, *Spayd v. Ringing Rock Lodge No. 665, Brotherhood of Railroad Trainmen of Pottstown*, in which the court allowed the plaintiff-union member to sue his union after he was expelled for

In the employment context, a couple of states have similarly held that the provision in their state constitution that includes the right to petition is not enforceable against private parties.[21] *See Edmondson v. Shearer Lumber Prods.*, 75 P.3d 733, 738–39 (Idaho 2003) (dismissing claim of retaliatory discharge against private employer based on rights of free speech and association in state constitution); *Grzyb v. Evans*, 700 S.W.2d 399, 402 (Ky. 1985) (dismissing claim of retaliatory discharge against private employer based on right of association in state constitution). While these cases do not directly address the right to petition, the holdings relate to associated expressive rights in the same provision, i.e., the rights to free speech and assembly.

In short, other states have generally held that the constitutional right to petition applies only to prohibit government abridgement and is not enforceable against private parties, irrespective of whether the right-to-petition provisions in their constitutions explicitly refer to government abridgement.[22]

---

signing a petition to the legislature in violation of the defendant labor union's bylaws, because unions "function solely by grace of the state." 113 A. 70, 71–72 (Pa. 1921). [Am. Br. pg. 27–8]. But *Spayd* does not involve retaliatory discharge of an at-will employee by a private employer. *See* A.W. Gans, Annotation, *Refusal of Member Labor Union to Pay Assessment Imposed by It for Purposes of Promoting or Defeating Contemplated Legislation as Ground for Suspension or Expulsion*, 175 A.L.R. 397 (1948); Joseph R. Grodin, *Constitutional Values in the Private Sector Workplace*, 13 Indus. Rels. L.J. 1, 12 & n.40 (1991) (citing *Spayd* and discussing the difference in laws applying to union-member relationships and employer-employee relationships). *Spayd* also appears contrary to *West Pennsylvania Socialist Workers 1982 Campaign*, 515 A.2d at 1335 ("[W]e conclude that the Declaration of Rights is a limitation on the power of state government."). We have found no other case indicating Pennsylvania's right to petition is enforceable against private parties.

[21] The American Civil Liberties Union and the American Civil Liberties Union of Tennessee cite a West Virginia case, *McClung v. Marion County Commission*, 360 S.E.2d 221, 223 (W. Va. 1987), which is inapposite because the plaintiff's employer was a government entity. *Id*. at 224–27.

[22] *See, e.g.*, *Cologne*, 469 A.2d at 1208–09 (concluding Connecticut's free speech and petition provisions "are designed as a safeguard against acts of the state and do not limit the private conduct of individuals or persons" despite the absence of language "expressly directed against state action only") (quoting *Lockwood v. Killian,* 375 A.2d 998, 1001 (Conn. 1977); *Woodland*, 378 N.W.2d at 348 ("We find no indication or warrant that the people of this state, in adopting our constitution, intended either of these provisions to apply against private parties. Accordingly, we interpret Const.[], art. 1, § 3 and § 5 as implicitly limited to protection against state action.") (Mich. Const. art. I, § 3 does not have explicit language forbidding government infringement); *W. Pa. Socialist Workers 1982 Campaign*, 515 A.2d at 1332–33 (holding the "Pennsylvania Constitution's guarantees of free speech and petition . . . . do[] not guarantee access to private property for the exercise of such rights") (Pa. Const. art. I, § 20 does not have explicit language forbidding government infringement). *But see Robins*, 592 P.2d at 347 (concluding California's free speech and petition provisions can be imposed upon certain private property owners).

The parties have pointed to no case in which a state has held that the right to petition under the state constitution could be the basis for a common-law claim of retaliatory discharge against a private employer, and we have found none.

### III. Right to Petition as Basis for Public Policy Exception to Employment-At-Will

Against that backdrop, we consider the parties' arguments on whether Ms. Smith can base a claim of retaliatory discharge against BlueCross on the exercise of her right to petition under Article I, Section 23 of the Tennessee Constitution.

At the outset, Ms. Smith points out that this Court has recognized an exception to at-will employment for violation of a clear public policy. She asserts that the policy can be shown by a constitutional provision such as Article I, Section 23 of the Tennessee Constitution. *Chism*, 762 S.W.2d at 556 (superseded by Tenn. Code Ann. § 50-1-304) ("To be liable for retaliatory discharge in cases such as this, the employer must violate a clear public policy. Usually this policy will be evidenced by an unambiguous constitutional, statutory or regulatory provision."). The constitutional right to petition reflects important public policy, Ms. Smith maintains, because "[t]he ability to contact one's legislators and seek redress for grievances is absolutely fundamental for any functioning free republic."

Ms. Smith notes that this Court may find that the right to petition in Tennessee's Constitution affords citizens greater protection than its corollary in the First Amendment to the federal Constitution. *See* Randy J. Holland, *State Constitutions: Purpose & Function*, 69 Temp. L. Rev. 989, 1003 (1996) ("The Declaration of Rights or substantive provisions in a state's constitution may, and often do, provide for broader or additional rights [than are in the federal Constitution]."). And we should do so in this case, Ms. Smith contends, based on differences in the text of Article I, Section 23, as compared to the text of the First Amendment to the federal Constitution.

The First Amendment of the federal Constitution provides: "Congress shall make no law . . . abridging . . . the right of the people peaceably to . . . petition the Government for a redress of grievances." U.S. Const. amend. I. This provision, Ms. Smith observes, "begins by naming the U.S. Congress as the subject of the prohibition" and "says nothing about what others may do to one's . . . right to petition."

In contrast, Article I, Section 23 of the Tennessee Constitution begins: "That the citizens have a right . . . ." Tenn. Const. art. 1, § 23. Ms. Smith points out: "The subject in this provision is not the government, but the citizens." In Ms. Smith's view, Article I,

Section 23 grants citizens a positive "right to communicate with the legislature unhindered." Because the text of Article I, Section 23 does not explicitly constrain only the government, Ms. Smith asserts it should be viewed as also protecting the right to petition against abridgement by private entities.

In support, Ms. Smith and Amici American Civil Liberties Union and American Civil Liberties Union of Tennessee cite *McKee v. Hughes*, 181 S.W. 930 (Tenn. 1916). In that case, several village residents filed a petition with their local village charter to close the plaintiff's store because he was operating it as a nuisance, and to revoke his business license. *Id.* at 930. The petition succeeded, and the charter revoked the plaintiff's license, damaging the plaintiff financially. *Id.* It was later determined, however, that the charter lacked this authority and the closure "was unwarranted by law." *Id.* at 930–31.

The storeowner plaintiff in *McKee* then sued the defendant village residents for damages, alleging that they were liable to him because they conspired to cause him injury. *Id.* at 930. The Court considered whether the defendant residents could be held liable as conspirators. *Id.* at 931. The Court first observed that the term "civil conspiracy" was defined as "a combination between two or more persons to accomplish by concert of action an unlawful purpose." *Id.* It noted that the residents, in petitioning the village council, were exercising "a high constitutional privilege," their rights under Article I, Section 23. *Id.* It held that liability for civil conspiracy could not be predicated upon the defendants signing such a petition, because signing a petition was not an unlawful purpose, absent malice and intent to injure the plaintiff. *Id.* at 931–32.

Ms. Smith and the Amici contend that *McKee* shows that "the constitutional right of petition not only 'secure[s] to every person . . . the right to apply to any department of the government for the redress of grievances,' but also 'guarantees' that people who seek such redress remain 'free from *any penalty* for having sought or obtained it.'" Amicus Br. 26 (quoting *id*. at 931) (emphasis added). In other words, *McKee* stands for the proposition that citizens must be allowed to petition their government without fear of negative consequences, including termination of their employment.

We first address Ms. Smith's argument on *McKee*. Respectfully, her interpretation extrapolates too much from *McKee*'s holding. The *McKee* Court pointed out that a claim of civil conspiracy requires a combination between persons to accomplish "an unlawful purpose." 181 S.W. at 931. It held only that petitioning a legislative body, in and of itself, is not unlawful. *Id.* at 932. Exercising the right to petition, *McKee* held, could form the basis for a claim of civil conspiracy only if it were coupled with an unlawful purpose, such as intent to injure the plaintiff storeowner. *Id*. at 931.

Here, BlueCross does not assert that Ms. Smith's actions in petitioning legislators were "unlawful." It says only that her actions violated BlueCross policy and were adverse to what BlueCross viewed as the best interest of the organization. And because Ms. Smith was an at-will employee, BlueCross could terminate her employment. *McKee* says nothing about whether Article I, Section 23 is enforceable against private parties or whether the right to petition can be the basis for a retaliatory discharge claim.

Addressing Ms. Smith's argument on the text of the right-to-petition provision, she is correct that, unlike the text in the federal constitutional provision on the right to petition, the text of Tennessee's provision does not explicitly make it enforceable against only the government.[23]

Critically, however, the text of Article I, Section 23 does not point in *either* direction; it neither precludes nor mandates a holding that it is enforceable against private entities. This contrasts with constitutional provisions whose text shows they are applicable only against government actors. *See, e.g.*, Tenn. Const. art. I, § 14 ("That no person shall be put to answer any *criminal charge* but by presentment, indictment or impeachment.") (emphasis added); Tenn. Const. art. I, § 20 ("That *no retrospective law*, or *law impairing the obligations of contracts*, shall be made.") (emphasis added). It also contrasts with constitutional provisions that would be rendered ineffectual if they were *not* deemed applicable against private parties. *See* Tenn. Const. art. I, § 33; *Nelson v. Smithpeter*, 42 Tenn. 13, 14 (1865) ("The amended constitution of the State of Tennessee . . . prohibits slavery or involuntary servitude, in the State of Tennessee, and it has ceased forever to exist.").

We consider, then, how the history of the right to petition offers insight into how citizens who ratified Tennessee's first constitution viewed the right. *See Cleveland Surgery Ctr., L.P.*, 30 S.W.3d at 282 (quoting *Martin*, 908 S.W.2d at 947) (noting our courts approach the text of constitutional provisions "in a principled way that takes into account the history, structure, and underlying values of the document.").

As outlined above, for hundreds of years, the constitutional right to petition has been considered a bulwark against *government* oppression, not a constraint on private parties. Both British citizens and American colonists "understood their right to petition as protection from reprisals by the Crown." Pfander, *supra*, at 903 n.16. As other states have noted, "[t]he historical intention of state constitutions . . . was a reaction to the dire

---

[23] We note that "this Court has the authority to interpret the Tennessee Constitution differently than the federal constitution and . . . textual differences between federal and state constitutional provisions may support doing so." *State v. Tuttle*, 515 S.W.3d 282, 307 (Tenn. 2017); *see State v. Watkins*, 362 S.W.3d 530, 554–55 (Tenn. 2012); *State v. Vineyard*, 958 S.W.2d 730, 733–34 (Tenn. 1997).

experience with England to recognize rights of the people and protect them from *governmental* interference." *Jacobs v. Major*, 407 N.W.2d 832, 840 (Wis. 1987) (emphasis added). Nothing in this history indicates the framers envisioned it as enforceable against private parties.

In addition, as outlined above, the majority of states that have considered whether their constitutional right to petition is enforceable against private entities have concluded that it is not. *See* discussion *supra* Section II.C. They have held that the right to petition prohibits government abridgment of the right and is not a constraint on private parties. *See, e.g.*, *Woodland*, 378 N.W.2d at 348 (holding Michigan's constitutional guarantees of free speech, assembly, and petition are not applicable to private parties).

Here, Ms. Smith points to nothing indicating that the framers of Tennessee's Constitution viewed the right to petition differently from the federal Constitution or any other state constitution. *See Cleveland Surgery Ctr., L.P.*, 30 S.W.3d at 282 (quoting *Martin*, 908 S.W.2d at 947) (finding guidance from "other similar state and federal constitutional provisions"). Centuries of history of the right to petition—in Britain before formation of the American colonies, in the American colonies before adoption of the federal Bill of Rights, and in our nation's ratification of the Bill of Rights to the federal Constitution—leads us to hold that Article I, Section 23 in the Tennessee Constitution is not enforceable against private parties.[24]

How does this holding affect Ms. Smith's claim for retaliatory discharge? To prove an employer violated the law by terminating a plaintiff's employment, the plaintiff must show something more than the exercise of a constitutional right. If a constitutional provision only constrains the government, it would be anomalous to conclude that an employer violates "public policy" by terminating an employee for exercising that

---

[24] The importance of the right to petition is not diminished by holding it is enforceable against governmental bodies but not private parties, as can be seen with other constitutional rights considered foundational to our republic. *See, e.g.*, *Stein*, 945 S.W.2d at 718 (as to constitutional principles of search and seizure: "Since this appeal involves a private employer/employee relationship, those important constitutional considerations are not at issue."); Restatement of Employment Law § 5.03, cmt. b (2015) ("For example, the privacy protections found in the Fourth and Fourteenth Amendments of the U.S. Constitution protect only government workers from unreasonable searches; these protections do not apply directly to private-sector workers.").

> [B]y exempting private action from the reach of the Constitution's prohibitions, it stops the Constitution short of preempting individual liberty—of denying to individuals the freedom to make certain choices . . . . Such freedom is basic under any conception of liberty, but it would be lost if individuals had to conform their conduct to the Constitution's demands.

*Woodland*, 378 N.W.2d at 347 (quoting Laurence H. Tribe, *American Constitutional Law*, 1149 (1978)).

constitutional right. *See Stein*, 945 S.W.2d at 718 (holding that the state constitutional guarantee of privacy "is not a source of public policy which restricts the right of private employers to discharge terminable-at-will employees who test positive on random drug tests"); *Rigsby v. Murray Ohio Mfg. Co*., No. 01-A-019012CV00457, 1991 WL 95710, at *2 (Tenn. Ct. App. June 7, 1991) (holding that termination for exercising free speech rights not actionable because "[p]ublic policy does not require that an employee be given a cause of action when he is terminated for doing what the employer could prohibit"). Most "constitutional provisions protect citizens from abusive and intrusive government action but do not control relationships between private individuals, including employer—employee relationships." *Stein*, 945 S.W.2d at 718. *See also* Restatement of Employment Law § 5.03, cmt. b. (2015) (summarizing that both "the federal constitution and most state constitutions primarily address government action and as a general matter do not apply directly to private-sector employers or employees"). A choice "[t]o turn what was prohibition of governmental acts into positive rights against other private persons is n[either] logical nor historically established." *Jacobs*, 407 N.W.2d at 840.

Despite the right to petition having been in existence for centuries, Ms. Smith does not point to a single case—in any state—permitting a retaliatory discharge claim against a private employer based on the employee's exercise of the constitutional right to petition. Such a holding would be inconsistent with the description of retaliatory discharge in our cases as a narrow, limited exception to the employment-at-will doctrine. *See, e.g.*, *Chism*, 762 S.W.2d at 556 (describing retaliatory discharge as an important but narrow exception that cannot be allowed to "consume" the employment-at-will doctrine); *Franklin*, 210 S.W.3d at 530–31 (describing retaliatory discharge as applicable only in limited circumstances) (quoting *Stein*, 945 S.W.2d at 717). It would mean that, at times, employers could be required to continue employing persons engaged in actions perceived as against the employers' best interest. *See, e.g.*, *Korb v. Raytheon Corp*., 574 N.E.2d 370, 372–73 (Mass. 1991) (noting that terminated employee "is free to express whatever opinions he wishes. [Employer] need not pay him to do so."); *Tiernan v. Charleston Area Med. Ctr., Inc*., 506 S.E.2d 578, 590 (W. Va. 1998) ("[W]hile the employer has no right to control the employee's speech, he does have the right to conclude that the employee's exercise of his constitutional privileges has clearly over-balanced his usefulness and . . . so to discharge him.") (quoting *Truly v. Madison Gen. Hosp.*, 673 F.2d 763, 767 (5th Cir. 1982)).

We hold that BlueCross did not violate a "clear public policy" evidenced by a constitutional provision by terminating Ms. Smith's employment for exercising her constitutional right to petition under Article I, Section 23 of the Tennessee Constitution. *Cf. Crews*, 78 S.W.3d at 858 (quoting *Stein*, 945 S.W.2d at 716–17). Thus, Ms. Smith cannot assert a claim of retaliatory discharge against BlueCross based on Article I, Section 23 of the Tennessee Constitution.

## CONCLUSION

For the foregoing reasons, we hold Article I, Section 23 of the Tennessee Constitution is enforceable against governmental entities, not private parties. It cannot be the basis for a "public policy" exception to the employment-at-will doctrine as against private employers. Accordingly, we hold that at-will employees may not assert claims of retaliatory discharge against private employers based on the right to petition in Article I, Section 23 of the Tennessee Constitution. We reverse the holding of the Court of Appeals and affirm the trial court's grant of BlueCross's motion to dismiss Ms. Smith's claim for failure to state a claim upon which relief can be granted. The case is remanded to the trial court for any necessary further proceedings consistent with this Opinion. Costs of this appeal are taxed to the appellee Heather Smith, for which execution may issue if necessary.

    s/Holly Kirby, Chief Justice
HOLLY KIRBY, CHIEF JUSTICE

- 21 -